PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 15-2466 & 15-2586
_____

1621 ROUTE 22 WEST OPERATING COMPANY, LLC,
d/b/a SOMERSET VALLEY REHABILITATION AND
NURSING CENTER,

Petitioner in No. 15-2466

v.

NATIONAL LABOR RELATIONS BOARD,

Petitioner in No. 15-2586
_____

On Petition for Review of an Order of the National Labor
Relations Board
& Cross-Application for Enforcement
(NLRB Nos. 1:22-CA-029599, 22-CA-029628
and 22-CA-029868)
_____

Argued
February 29, 2016

Before: AMBRO, JORDAN, and SCIRICA, *Circuit Judges*.

(Filed: June 6, 2016)
_____

Rosemary Alito   [ARGUED]
George P. Barbatsuly
Laura Scully
K&L Gates LLP
One Newark Center
10th Floor
Newark, NJ   07102
      *Counsel for Petitioner/Cross-Respondent,*
      *1621 Route 22 West Operating Company LLC,*
      *d/b/a Somerset Valley Rehabilitation and Nursing*
      *Center*

Jeffrey W. Burritt   [ARGUED]
Linda Dreeben
Jill A. Griffin
National Labor Relations Board
Appellate and Supreme Court Litigation Branch
1015 Half Street, S.E.
Washington, DC  20570

Benjamin M. Shultz   [ARGUED]
U.S. Department of Justice
Civil Division, Room 7211
950 Pennsylvania Ave., N.W.
Washington, DC 20530
      *Counsel for Respondent/Cross-Petitioner*
      *National Labor Relations Board*

Katherine H. Hansen
William S. Massey
Patrick J. Walsh
Gladstein Reif & Meginniss LLP
817 Broadway
6th Floor
New York, NY   10003
  *Counsel for Intervenor, 1199 SEIU*
  *United Healthcare Workers East New Jersey Region*

———————————

OPINION OF THE COURT

———————————

JORDAN, *Circuit Judge*.

  Somerset Valley Rehabilitation and Nursing Center ("Somerset" or the "Employer"), known formally as 1621 Route 22 West Operating Company, LLC, petitions for review of an Order of the National Labor Relations Board ("NLRB" or the "Board") that declared Somerset had committed several unfair labor practices in violation of Section 8 of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158.  The Board cross-applies for enforcement of that Order.  We will deny the petition for review and grant the cross-application for enforcement.

## I. Background

  This dispute arises out of a union election and its aftermath at Somerset in 2010.  The nurses at the facility organized under the auspices of 1199 SEIU United

Healthcare Workers East, New Jersey Region (the "Union"), which is an intervenor in this case in support of the Board. According to the Union and the Board, Somerset engaged in unfair labor practices – both during and after the election – in an effort to discourage the exercise of labor rights.

We begin by recounting the background of the dispute and the lengthy procedural history that brings it before us now. Under the NLRA, "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). Given the deference we thus owe to the Board's fact-finding, and further given that Somerset's objections are principally to the Board's legal conclusions, we recount the facts as found by the Board, which itself adopted the findings of the Administrative Law Judge ("ALJ") who initially heard the complaint against Somerset.

## A. Factual Background

Somerset is a 32-room, 64-patient-maximum nursing and rehabilitation center in Bound Brook, New Jersey, operated since 2006 by CareOne Management, Inc. ("CareOne"), a manager of multiple nursing and rehabilitation facilities. Somerset employs about 75 nurses in the relevant bargaining unit, which comprises registered nurses (RNs), licensed practical nurses (LPNs), and certified nurses' aides (CNAs). The ranks of the nurses include full-time employees, part-time employees, and "per diem" employees who work "as needed" and without a regular schedule. (J.A. 10.) In addition, Somerset employs supervisory nurses who act as managers. When a supervisory

4

nurse is not on duty, a senior nonsupervisory nurse will serve as a "charge nurse" to be the "link between the floor nurse and the physician." (J.A. 10.)

### 1. Pre-Election Period

The unionization drive began around June 2010, when Elizabeth Heedles, the Administrator of the facility, announced that Somerset would be reducing working hours and changing employees' schedules. Several nurses, including Sheena Claudio, Shannon Napolitano, and Jillian Jacques, were concerned about the new schedules they were asked to follow. One of the supervisory nurses, Jacqueline Southgate, who would become a key witness for the Union, was also troubled that her full-time schedule was to be downgraded.

Somerset emphasizes that, prior to the announced scheduling changes, the New Jersey Department of Health and Senior Services conducted a survey of the facility in December 2009 that resulted in two citations for violations of state standards.[1] As the ALJ later characterized the violations, "[t]he surveyors did not believe that a patient's pain was adequately controlled by the nurse assigned to her care." (J.A. 12.) Somerset suggests that the poor survey "resulted in increased scrutiny on the Somerset nursing department" and led it to begin revamping its operations to improve care. (Opening Br. at 8.) The ALJ, however, disagreed and saw the

---

[1] Specifically, Somerset received two "G" ratings for pain assessment. A "G" rating indicates that the error is "isolated in nature," but that the resident received "actual harm." (J.A. 3039.)

5

survey violations as routine, suggesting that Somerset's characterization was a *post hoc* pretext for anti-union actions. According to the ALJ, it was "common" for a facility to be cited for deficiencies, and, in this case, Somerset "corrected the deficiencies within a couple of weeks after receiving the report, and submitted a written plan of correction in late December 2009," which the state accepted. (J.A. 12.) A state recertification survey in January 2010, just a month after the original survey, found that Somerset was in substantial compliance, though the survey report did recommend a 27-day $200-per-day penalty for the December violations.

Whatever the motive for the operational changes at Somerset, they prompted concern among the nurses. Jacques responded by contacting CareOne's Vice President of Human Resources, Andrea Lee, who promised to "look into it." (J.A. 10.) Lee visited the facility, met with several nurses, expressed surprise about the large-scale changes, and promised to continue looking into it. She did not, however, follow up with the nurses any further. Consequently, they made contact with the Union and met with Union organizer Brian Walsh in late June 2010.

Claudio, Napolitano, and Jacques then began speaking about the Union with their colleagues at Somerset and generated interest from several other nurses, including Southgate, Valerie Wells, and Lynette Tyler. They prepared a pro-Union YouTube video, distributed and collected Union authorization cards,[2] held meetings at employees' homes and

---

[2] Although a Board-supervised election is "[t]he most commonly traveled route for a union to obtain recognition as the exclusive bargaining representative of an unorganized

6

at a local diner, and organized employees to wear pro-Union stickers. Their campaign culminated in a July 22, 2010 petition for a union election submitted to the Board by nurses Jacques and Napolitano and organizer Walsh. The Union then circulated to Somerset's employees a pro-Union brochure with photographs of 35 employees, including Claudio, Jacques, Napolitano, and Wells. Somerset acknowledges that "Napolitano, Claudio, and Jacques were among the leaders in the Union organizing campaign." (Opening Br. at 9 (citing J.A. 1673).)

Just over a week after the union petition was filed, CareOne's regional director, Jason Hutchens, brought Doreen Illis into Somerset to replace Heedles as Administrator. Illis was transferred from a substantially larger CareOne facility, and Heedles took over at the facility that Illis left. The ALJ expressed doubt that Heedles was shifted for reasons of effectiveness, noting that she was transferred to lead a facility with double the number of beds, and that CareOne was aware of the disenchantment with the scheduling changes at Somerset. Somerset made other management changes in

---

group of employees," an alternative way for a union to establish majority support is "possession of cards signed by a majority of the employees authorizing the union to represent them for collective bargaining purposes." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 596-97 (1969). A union that collects authorization cards for a majority of employees can thus claim to be the exclusive bargaining representative for employees pursuant to § 9(a) of the NLRA, 29 U.S.C. § 159(a). Claudio, Napolitano, and Jacques were distributing that type of card to fellow nurses, though ultimately a union election was held.

7

August 2010, including bringing in Inez Konjoh as a replacement Director of Nursing and giving Southgate management responsibilities.

## 2.  Election Campaign

By late July, after the union petition was filed, an election campaign was in full swing. Somerset campaigned vigorously against the union – as it had a right to do – but in so doing it undertook actions that the Board later concluded crossed the line into unfair labor practices.

Hutchens held several meetings with employees and received their complaints about the controversial schedule changes. That schedule was ultimately not implemented. In the meetings, Hutchens apologized for the proposed changes and said that he had brought in a new Administrator and Director of Nursing to rectify the problems. When employees pressed him about ongoing problems, he noted that any policy changes during the union election would be illegal, but he asked the employees to give Somerset a chance to show them that things could improve. Several employees testified about the meetings and further indications from CareOne managers that they would "fix" things. (J.A. 31) Several employees also testified that managers talked to them personally about the Union and urged them to vote against it.

Though he denied any unlawful activity, Hutchens acknowledged that the Employer ran a "vote no" campaign. (J.A. 14.) He and other Somerset officials held general meetings and spoke with nurses at the nursing stations. Chris Foglio, the Chief Executive Officer of CareOne, met with employees and discussed benefits that CareOne might offer,

8

including support for housing expenses and tuition reimbursement. Management held meetings within its own ranks, discussing Union activities and how each individual nurse might vote. It also distributed leaflets to employees to dissuade them from voting for the union.

Management rectified some specific complaints during the campaign. When one nurse, Annie Stubbs, complained about a lack of garbage bags, garbage bags were distributed the next day. When Tyler told Illis her responsibilities were overwhelming her, a week later her duties were reduced at about the same time that Illis asked her to convince other employees to vote against the Union.

The election was finally held on September 2, 2010. Out of 71 votes cast, 38 were for the Union and 28 against, with five ballots being subject to challenge. After hearing and overruling Somerset's objections, an NLRB hearing officer certified the Union in January 2011, a decision affirmed and certified by the Board in August 2011.

### 3. Post-Election Acts of Alleged Retaliation

At issue in this case is the Board's conclusion that Napolitano, Claudio, Jacques, and Wells were discharged as retaliation for their unionization activities. Claudio, Jacques, and Napolitano were "the three leading union advocates." (J.A. 32) They contacted the Union and worked with Walsh to organize the nurses at Somerset; they appeared in the Union brochure and YouTube video; and they served as the Union's election observers. Wells also appeared in the YouTube video and in the brochure; she signed an

authorization card for the Union; and she spoke favorably about the Union at work. Those facts, paired with the conclusion that Somerset's "animus toward the Union is beyond question," led the ALJ to decide that the union activities of those women "were well known to" Somerset, which then targeted them for retaliation. (J.A. 32.)

The first set of actions that formed the basis for the NLRB's investigation of post-election events at the nursing home concerned Somerset's enforcement of its attendance policy. Only 11 days after the election, Somerset issued two attendance warnings to Jacques, two to Claudio, and one to Napolitano, even though "[t]hey had not received written discipline prior to the election for the[ir] ... attendance records." (J.A. 32.) The timing was troublesome – before the election, Somerset was lax with regard to attendance, but immediately after the election Konjoh took a personal interest in tardiness. Illis did not begin to focus on attendance until six weeks into her tenure as Administrator, after the election. Not only did the three nurses receive discipline for recent attendance issues, they were disciplined for lateness and absences dating back to nine months prior to the election. Before the election, only one employee had ever received formal discipline for attendance problems.

The second set of Somerset's actions at issue before the Board had to do with performance-based discipline. That discipline became significantly stricter immediately after the election. The ALJ concluded that

> [medicine and treatment] records were not
> scrutinized as carefully before the election as
> they were after the election, and ... any errors in

10

those records found prior to the election were rarely the subject of discipline. For example, [Somerset] offered in evidence numerous examples of discipline given to employees after the election for performance issues, but could only present three instances of discipline prior to the election. Even as to them, the maximum discipline issued was a written warning.

(J.A. 33.)

There were also suspicious circumstances, in the ALJ's view, surrounding the dismissal of each of the four employees at issue. Claudio received her first warning ever on September 20 and her second on September 27. She received a two-day suspension on October 1, which was unusually severe compared to another nurse who committed the same infraction. Finally, she was discharged on October 21 for an infraction – completing medical chart entries after her shift rather than during it – which was a "not uncommon" practice according to Southgate's testimony. (J.A. 34.)

Jacques had worked at Somerset for 11 years. She was discharged for record-keeping errors that, prior to the election, "would have been remedied with in-service training" and for which "other nurses received less discipline." (J.A. 34.) The sudden discharge came even as Somerset continued to put Jacques in the senior role of charge nurse, acknowledging her "experience and expertise." (J.A. 7.) Moreover, Southgate testified that Konjoh told her that Somerset management was watching union organizers closely for infractions, and an employee who was a confidant of Illis's testified that "Illis

11

told him to look for errors committed by Jacques in her charting." (J.A. 34.)

Napolitano was discharged two weeks after the election for improperly administering a zinc pill to a patient. She did improperly administer the pill, but Konjoh seemed intent on collecting evidence to support disciplinary action because she had instructed the patient to save any improperly administered pills rather than correct an error when discovered. Three other nurses made the same mistake and faced no discipline. A second reason cited for Napolitano's dismissal was that she noted a patient's pulse oxygen level at 0%, "an obvious error in documentation" that would have been "simply corrected" before the election. (J.A. 35.)

Wells was a staffing coordinator at Somerset for five years before the election and had not previously been disciplined. She was on vacation during the election, and when she returned to work five days afterward, she was given a disciplinary warning for the first time. She had failed to reconcile discrepancies between manually typed schedules and entries in the computerized system for the prior weekend's shifts. Somerset's past practice would have allowed her to have the morning to correct the scheduling inconsistencies on her first day back. Instead, she was written up, and she received two more warnings the following week for mistakes in inputting employee schedules and a failure to provide Konjoh a written schedule. She was discharged on September 21, within three weeks of the election. The ALJ acknowledged that the scheduling errors and failure to properly use the electronic system were problematic, but he concluded that the sudden and rapid discipline following the

election suggested that the true motivation for Wells's discharge was retaliation.

The ALJ found two additional retaliatory acts against other employees. First, when union-supporter Tyler left Somerset, her records were marked with a notation that she was "not eligible for rehire – resigned with bad attitude toward company." (J.A. 35.) She received this negative notation, even though before the election Illis had encouraged her to stay or take advantage of a tuition-assistance program. Separately, Somerset dropped several per diem employees within the two to three weeks following the election. To find replacements, Illis solicited a per diem nurse at another CareOne facility to come to Somerset and recommend other per diem employees who "would vote in [Somerset's] favor in a new election" if the results of the first election were overturned. (J.A. 36.)

## B. Procedural Background

Somerset's anti-union activities led the Union to file charges with the NLRB, all of which were eventually consolidated into a complaint issued on April 6, 2011. After 19 days of hearings, the ALJ issued a decision against Somerset. The Board adopted the ALJ's decision in its September 26, 2012 Order (the "2012 Order").

While the Board was considering the case, it separately sought temporary injunctive relief before the United States District Court for the District of New Jersey, under § 10(j) of the NLRA, 29 U.S.C. § 160(j).[3] The District Court granted in

---

[3] Under § 10(j) of the NLRA, "[t]he Board shall have

13

part and denied in part the injunctive relief, ordering the reinstatement of Napolitano and Claudio but denying reinstatement to Jacques and Wells. That decision was ultimately vacated by our Court in *Lightner ex rel. NLRB v. 1621 Route 22 West Operating Co., LLC*, 729 F.3d 235 (3d Cir. 2013), because the Board's September 2012 Order made the § 10(j) proceedings moot. We noted, however, that "[v]acating the opinion and order entered by the District Court ... will have no effect on the existence or record of the proceedings before it," and that "we know of no ruling that would hinder Somerset ... from relying on appropriate facts in the District Court record." *Id.* at 238.

Subsequently, in June 2014, the Supreme Court ruled in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), that several members of the Board had been appointed in violation of the Recess Appointments Clause of the Constitution. We then granted the Board's motion to vacate the 2012 Order and to remand because two members of the Board who sat on that three-member panel had been invalidly appointed in light of *Noel Canning*. The Board issued a new Order on June 11, 2015 ("2015 Order" or the "Order"), affirming its 2012 Order and the ALJ decision. In addition to reaffirming those prior decisions, the Board expressly rejected the reasons that the District Court had given when denying complete relief in the

power, upon issuance of a complaint ... charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order." 29 U.S.C.§ 160(j).

14

§ 10(j) proceedings. The Board reiterated the conclusion from the 2012 Order that, since "virtually all" of the discipline imposed for the supposed deficiencies of the employees was unlawfully motivated, such discipline could not be the basis for avoiding the remedy of reinstatement and back pay. (J.A. 1.) According to the Board, the errors ascribed to Jacques and Wells had long predated the union election and were merely pretexts that could not preclude reinstatement.

Somerset petitioned us to review the 2015 Order, and the Board cross-applied for enforcement. Those are the applications before us now.

## II.     Jurisdiction

The NLRB had jurisdiction over this matter under 29 U.S.C. § 160(a). We have jurisdiction to review the Board's final order pursuant to 29 U.S.C. § 160(f) and jurisdiction to consider the application for enforcement pursuant to 29 U.S.C. § 160(e). Our jurisdiction over particular issues, however, is limited by the exhaustion requirement embedded in that last statutory subjection, which is § 10(e) of the NLRA. Section 10(e) provides that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). The exhaustion requirement is jurisdictional. Except in the rare case that presents extraordinary circumstances, a "Court of Appeals lacks jurisdiction to review objections that were not urged before the Board." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982).

15

The exhaustion requirement is important in this case because one of the principal grounds for review that Somerset urges upon us was never raised before the Board. Specifically, Somerset now contends that the NLRB's Acting General Counsel was serving in violation of the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345, *et seq.*, at the time he filed the initial complaint against Somerset, and that the subsequent actions of the Board are thus infirm. That argument is new, so before we can address its merits, we must determine whether we have jurisdiction to consider it at all.

Somerset argues that the lawfulness of the General Counsel's service "is a jurisdictional issue that goes to the Board's very authority to act," suggesting that we may therefore review the issue despite the exhaustion bar in § 10(e). (Opening Br. at 38.) As Somerset notes, the General Counsel of the NLRB has "final authority ... in respect of the investigation of charges and issuance of complaints" alleging unfair labor practices. 29 U.S.C. § 153(d). Though the General Counsel may delegate authority to regional directors, 29 C.F.R. § 101.8, "[t]he practical effect of [the NLRA's] administrative scheme is that a party believing himself the victim of an unfair labor practice can obtain neither adjudication nor remedy under the labor statute without first persuading the Office of General Counsel that his claim is sufficiently meritorious to warrant Board consideration," *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 139 (1975).

Somerset is certainly correct that the General Counsel of the NLRB plays a gate-keeping role in all unfair labor practices cases. But that does not itself provide jurisdiction for us to review the lawfulness of the President's designation of an Acting General Counsel. Our jurisdiction to review the

16

acts of administrative agencies is a product of statutory grant, and Congress has broad discretion to determine the breadth of that jurisdiction. *See Lauf v. E.G. Shinner & Co.*, 303 U.S. 323, 330 (1938) ("There can be no question of the power of Congress [] to define and limit the jurisdiction of the inferior courts of the United States."). Congress may, for instance, remove from federal courts the jurisdiction to issue injunctions in labor disputes. *Id.* at 329-30. It may require that challenges to a law be brought in "one tribunal rather than in another," and parties may forfeit their rights "by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." *Yakus v. United States*, 321 U.S. 414, 444 (1944). The latter is precisely what Congress has done in § 10 of the NLRA. Somerset's admitted failure to follow the process that Congress established for challenging the lawfulness of the Board's actions therefore precludes it from pressing its FVRA claim unless it can point to a specific grant of jurisdiction.[4]

---

[4] There are some limitations on Congress's ability to regulate federal court jurisdiction. As relevant here, there may be cases in which Congress makes challenging the lawfulness of government action in enforcement proceedings so burdensome that a party must be allowed to bring an independent action. *Ex parte Young*, 209 U.S. 123, 148 (1908). But Somerset's case does not require us to consider thorny boundary questions of federal court jurisdiction. In the labor context, Congress has provided an orderly scheme allowing parties to challenge the lawfulness of the NLRB's actions before the Board and then to seek review from a Court of Appeals if that challenge is unsuccessful. Unsurprisingly, it requires that, through the exhaustion bar of § 10(e), the

17

Somerset's argument that its FVRA claim is "jurisdictional" in nature – thereby giving us some inherent authority to review it – is unconvincing. As the Supreme Court explained in *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013), there is a significant difference between the concept of "jurisdiction" in the judicial context and in the administrative context. In the former, "there is a meaningful line" between jurisdictional and non-jurisdictional questions, because "[w]hether the court decided *correctly* is a question that has different consequences from the question whether it had the power to decide *at all*." *Id.* at 1868 (emphasis in original). But, that is not the case in the latter, administrative, context. When agencies are charged with administering congressional statutes,

> [b]oth their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires. Because the question – whether framed as an incorrect application of agency authority or an assertion of authority not conferred – is always whether the agency has gone beyond what Congress has permitted it to do, there is no principled basis for carving out some arbitrary subset of such claims as "jurisdictional."

*Id.* at 1869. Therefore, if the Board was acting unlawfully in considering a complaint brought by an improperly serving

Board be given a chance to address any objections in the first instance.

Acting General Counsel, its actions were no more *ultra vires* than if the Board had misapplied the NLRA. We consider both sorts of claims under the strictures of that statute, including the exhaustion bar of § 10(e). Again, that bar permits consideration of arguments not raised before the Board only when late consideration can be justified by "extraordinary circumstances." 29 U.S.C. § 160(e).

To overcome that straightforward reading of both the NLRA and long-established case law on Congress's power to shape federal appellate court jurisdiction, Somerset leans heavily on two sentences from our opinion in *NLRB v. Konig*, stating that there is a

> distinction between jurisdiction in the sense of the overall authority of the Board to hear the case under the NLRA and the jurisdiction of the Board to issue an order based upon a factual determination made by the Board. "While the Board's statutory jurisdiction may be raised at any time, the facts upon which the Board determines it has jurisdiction may be challenged only upon timely exception."

79 F.3d 354, 360 (3d Cir. 1996) (quoting *NLRB v. Peyton Fritton Stores, Inc.*, 336 F.2d 769, 770 (10th Cir. 1964)). Based on that quotation, Somerset argues that it may raise its challenge regarding the Acting General Counsel "at any time" because the issue implicates "the overall authority of the Board to hear the case." *Id.* That position cannot prevail for three reasons.

19

First it conflicts with the Supreme Court's subsequent instruction in *City of Arlington* that any distinction between a "jurisdictional" and "nonjurisdictional" exercise of agency authority is merely "illusory." 133 S. Ct. at 1869. The Court was there considering deference to agency interpretations of statutes, but the logic applies equally to judicial review of an agency's adjudicatory process. To rephrase the principle noted above, "[b]oth [the Board's] power to act and how [it] act[s] [are] authoritatively prescribed by Congress," and when the Board "act[s] improperly" what it does is *ultra vires* "no less than when [it] act[s] beyond [its] jurisdiction." *Id. City of Arlington* tells us plainly that we are not supposed to "sift[] the entrails of vast statutory schemes to divine whether a particular" exercise of agency authority "qualifies as 'jurisdictional' … ." *Id.* at 1871.

Second, the language in *Konig* is too general to support Somerset's conclusion that we are free to review unexhausted challenges to agency action whenever such a challenge can be framed as "jurisdictional." The case does not define what is meant by "the overall authority of the Board to hear the case under the NLRA." *Konig*, 79 F.3d at 360. Nor does it explain whether we may hear those challenges based on some inherent power or because they meet the "extraordinary circumstances" exception to the exhaustion bar of § 10(e). Somerset's "inherent power" theory would be a novel assertion of judicial authority, and we decline to read that much into such vague language.

That particular passage from *Konig* also happens to be dicta, which is the third reason we decline to read it as allowing Somerset to avoid the exhaustion bar. In the paragraph immediately following *Konig*'s distinction between

20

"the overall authority of the Board to hear the case under the NLRA and the jurisdiction of the Board to issue an order based upon a factual determination made by the Board," we went on to rule that the issue raised in *Konig* was the latter type of case, based on a "factual determination by the Board." 79 F.3d at 360. We applied the exhaustion bar of § 10(e) and refused to hear the claim, *id.* at 361, so there was no need to consider any broader form of authority to review "jurisdictional" challenges, since none was implicated in *Konig*.[5] Thus, any observations in the opinion about broader jurisdiction were irrelevant to the holding and do not bind us now. *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 274 (3d Cir. 2007). [6]

---

[5] The same was true in the Tenth Circuit case from which *Konig* draws the key language at issue here. That court also declined to consider the petitioner's objection, as it was a factual question barred by the exhaustion requirement. *Peyton Fritton*, 336 F.2d at 770 ("No exceptions having been taken, and no extraordinary circumstances appearing which would excuse their absence, the facts upon which jurisdiction was found are not now subject to question.").

[6] Somerset also leans heavily on our opinion in *NLRB v. New Vista Nursing & Rehabilitation*, 719 F.3d 203 (3d Cir. 2013), *reh'g granted* (Aug. 11, 2014), which does indeed more directly support its argument. But that opinion was vacated when rehearing was granted, so it carries no precedential force. *See* Third Circuit I.O.P. 8.3.1. To the extent that it diverges from our reasoning, we respectfully decline to follow it.

The *New Vista* panel read *Konig* broadly and asserted an inherent jurisdiction to review agency authority to act,

Our conclusion accords with the developing consensus of other courts that have considered this issue. In addressing challenges to the appointments of members of the Board itself, three Circuits have determined that they need not hear objections that were unpreserved. *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 350 (5th Cir. 2013); *GGNSC Springfield LLC v. NLRB*, 721 F.3d 403, 406 (6th Cir. 2013); *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013). [7] When the D.C. Circuit did hear such an unpreserved argument, it was not because the objection was "jurisdictional," but rather because the objection satisfied the "extraordinary circumstances" exception to the § 10(e) exhaustion bar. *Noel Canning v. NLRB*, 705 F.3d 490, 496 (D.C. Cir. 2013). Our Court recently expressly adopted the D.C. Circuit's logic to hold that unexhausted post-*Noel*

---

based largely on analogy to courts of appeals reviewing district courts' jurisdiction. 719 F.3d at 210-12. Because *New Vista* was decided before the *City of Arlington* opinion issued, the panel did not have the benefit of the Supreme Court's explanation of why a "jurisdictional" versus "nonjurisdictional" contrast is inapposite in the administrative law context. We are bound to follow the Supreme Court's instruction that treating any particular question of agency action as "jurisdictional" is "arbitrary." *City of Arlington*, 133 S. Ct. at 1869.

[7] In fact, before the Supreme Court abandoned the distinction between jurisdictional and nonjurisdictional exercises of agency authority in *City of Arlington*, it expressly characterized constitutional Appointments Clause objections as "nonjurisdictional." *Freytag v. C.I.R.*, 501 U.S. 868, 878 (1991).

22

*Canning* challenges to the composition of the NLRB may be heard because they satisfy the "extraordinary circumstances" exception to § 10(e). *Advanced Disposal Servs. E., Inc. v. NLRB*, No. 15-2229, 2016 WL 1598607, at *4 (3d Cir. Apr. 21, 2016).[8]

All of those cases concerned challenges to the authority of the Board itself to act based on the constitutional infirmity of its members' appointments. Even in those cases, courts have looked only to the "extraordinary circumstances" exception to § 10(e) rather than to some non-statutory ground to excuse a failure to exhaust. Somerset now asks us to create an even broader exception to § 10(e) for its statutory challenge to the Acting General Counsel's appointment. We decline to do so. That puts us in accord with the principal opinion upon which Somerset relies to support its FVRA defense, in which the D.C. Circuit expressed doubt that the argument then before it, if unpreserved, could be raised in court. *See SW Gen., Inc. v. NLRB*, 796 F.3d 67, 83 (D.C. Cir. 2015) ("We doubt that an employer that failed to timely raise an FVRA objection ... will enjoy ... success.").[9]

---

[8] A footnote in the *Advanced Disposal* opinion suggested that a violation of the NLRB's quorum requirement may "be considered 'jurisdictional' in the sense that a challenge brought under it cannot be forfeited by failure to raise it before the agency." 2016 WL 1598607, at *4 n.6. We expressly noted, however, that the observation was "not necessary to our holding," *id.*, so it is dicta that does not now bind us, *Galli*, 490 F.3d at 274.

[9] Somerset also urges us to consider a recent Ninth Circuit opinion endorsing Somerset's and the D.C. Circuit's

Since Somerset has no way around the § 10(e) exhaustion requirement, we lack jurisdiction to consider its FVRA objection unless its "failure ... to urge such objection [is] excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Somerset's briefing, however, makes no mention of the extraordinary circumstances exception. At oral argument, Somerset acknowledged that the "focus of [its] argument" was on the assertion of some broader jurisdiction than is granted in the "extraordinary circumstances" exception to § 10(e). (Oral Arg. Tr. 6.) We therefore have no argument before us as to why the present circumstances are so extraordinary as to warrant review without the Board having had the first opportunity to address Somerset's objection. [10] Consequently, we will apply the § 10(e)

interpretation of the FVRA. *See Hooks v. Kitsap Tenant Support Servs., Inc.*, No. 13-35912, 2016 WL 860335 (9th Cir. Mar. 7, 2016). That case arose from a § 10(j) proceeding for interim injunctive relief, where the employer raised its FVRA objection before the district court at the first opportunity. *Id.* at *2. It thus does not bear on the issue of the § 10(e) exhaustion bar. If anything, the *Hooks* court sought to limit the reach of its ruling by expressly noting that "not ... every violation of the FVRA will result in the invalidation of the challenged agency action." *Id.* at *11.

[10] In a filing well after the completion of briefing and oral argument, Somerset suggests that our Court's *Advanced Disposal* opinion "confirms that Somerset may present the [FVRA] issue now, even thought it did not raise the issue below." (Somerset 28(j) Letter, at 2, Apr. 26, 2016.) Somerset's briefing relied exclusively on the extra-statutory jurisdictional basis to excuse its failure to exhaust, and its

24

exhaustion bar, and, lacking jurisdiction to consider Somerset's objection to the Board's order on the basis of the FVRA, we will proceed to consider only those objections "urged before the Board." 29 U.S.C. § 160(e).

## III. Discussion

Somerset petitions for review of the Board's Order based on the following grounds. First, it asks us to vacate the Order because Chairman Mark Gaston Pearce should have recused himself in response to Somerset's motion for recusal.

---

attempt to shift to an "extraordinary circumstances" argument comes far too late for us to consider it. *See In re Fosamax Products Liab. Litig.*, 751 F.3d 150, 157 (3d Cir. 2014).

We pause only to note that, even if Somerset had properly advanced an "extraordinary circumstances" argument, *Advanced Disposal* would not be dispositive because its facts are so readily distinguishable from this case. *Advanced Disposal* involved "a challenge which [went] to the composition of the NLRB" itself, rather than to the authority of the Acting General Counsel. 2016 WL 1598607, at *4. Moreover, *Advanced Disposal* was based on a "rare and remarkable" recent Supreme Court decision resolving constitutional limitations on the President's recess appointments power. *Id.* at *1 (internal quotation marks omitted). Somerset's challenge, on the other hand, is based on the FVRA statutory scheme, which has been in place since 1998. *See* Pub. L. No. 105–277, div. C, tit. I, § 151. Even were the "extraordinary circumstances" argument preserved, then, simple analogy to *Advanced Disposal* would be insufficient, on its own, to excuse Somerset's failure to exhaust.

25

As to the merits of the Order, Somerset challenges the Board's determination that its conduct involved unfair labor practices. Finally, it argues that, even if it did violate the NLRA by dismissing certain employees, reinstatement is not the appropriate remedy in this case. We consider each objection in turn.

### A.     Motion to Recuse

Somerset asks us to vacate the Board's Order because, it says, Chairman Pearce should have recused himself from the three-member panel that heard this case. According to Somerset, recusal was necessary because Ellen Dichner, who was serving as chief counsel to Chairman Pearce, had previously represented the Union in this very case, both before the ALJ and in the § 10(j) proceedings. While Somerset does not allege that Dichner participated in the Board's consideration of this case in any way, it argues that there is an inevitable appearance of impropriety because her subordinates would feel obliged to support her former client's position in their discussions with Chairman Pearce.

The Board denied Somerset's motion for recusal in its 2015 Order. It acknowledged that "Dichner, while in earlier private practice, represented the Charging Party Union in this case up to the exceptions stage," but contended that "Dichner has taken no part in the Board's consideration of this case." (J.A. 1 n.1.) Evidently, it was unimpressed by the "appearance of impropriety" issue.

"We review an agency member's decision not to recuse himself from a proceeding under a deferential, abuse of discretion standard." *Metro. Council of NAACP Branches*

26

*v. FCC*, 46 F.3d 1154, 1164 (D.C. Cir. 1995); *see also Mayberry v. Maroney*, 558 F.2d 1159, 1162 (3d Cir. 1977) (applying the same standard to recusal of district judges). That standard is premised on the principle that "'deferential review is used when the matter under review was decided by someone who is thought to have a better vantage point than we on the Court of Appeals to assess the matter.'" *United States v. Tomko*, 562 F.3d 558, 565 (3d Cir. 2009) (en banc) (quoting *United States v. Mitchell*, 365 F.3d 215, 234 (3d Cir. 2004)). [11]

We therefore do not put ourselves in the position of Chairman Pearce or the Board and make the recusal decision anew; rather, we simply review whether the decision was

---

[11] Somerset urges us to apply a more exacting standard, quoting *In re Kensington Int'l Ltd.*, 368 F.3d 289, 308 (3d Cir. 2004), for the proposition "that there is an almost irrebutable presumption that a judge is 'tainted' and must be disqualified where ... he surrounds himself with individuals who may not be truly disinterested." In that case, the district judge had appointed five advisors to assist him in a large asbestos case, and had a series of *ex parte* meetings with them. *Id.* at 297-98. We concluded that two of the advisors had "a structural conflict of interests" because they were also representing clients in separate cases involving asbestos. *Id.* at 303; *see also id.* at 304-05. Because the advisors helped draft legal opinions and provided substantive *ex parte* legal advice to "educate [the judge] on all the relevant issues," we determined that their participation did create an appearance of impropriety. *Id.* at 307. But *Kensington* is not similar to the case before us now because there is no allegation that Dichner actually participated in the proceedings. The abuse-of-discretion standard is applicable here.

27

arbitrary or unreasonable. *Id.* at 565. Given that there is no evidence that Dichner played any role in the consideration of this case, or that Chairman Pearce was less than diligent in screening her from the proceedings, and given further that the assertions about Dichner's indirect influence are based on speculation, we cannot say that the Board abused its discretion by maintaining the Chairman on the three-member panel.

## B. Unfair Labor Practices

Somerset also challenges the correctness of the Board's determination that it engaged in unfair labor practices. In considering the Board's decision, we accept factual findings as conclusive if supported by substantial evidence, while subjecting legal conclusions to plenary review with deference to the Board's interpretation of the NLRA. *Mars Home for Youth v. NLRB*, 666 F.3d 850, 853 (3d Cir. 2011).

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Citizens Publ'g & Printing Co. v. NLRB*, 263 F.3d 224, 232 (3d Cir. 2001) (internal quotation marks omitted). "In particular, we defer to the Board's credibility determinations, and will reverse them only if they are inherently incredible or patently unreasonable." *Grane Health Care v. NLRB*, 712 F.3d 145, 149 (3d Cir. 2013) (internal quotation marks omitted).

As to the Board's legal determinations, "[f]amiliar principles of judicial deference to an administrative agency apply to the NLRB's interpretation of the NLRA. Therefore, the NLRB's construction of the NLRA will be upheld if it is

'reasonably defensible.'" *Quick v. NLRB*, 245 F.3d 231, 240-41 (3d Cir. 2001) (quoting *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979)) (internal citation omitted). "[C]ourts of appeals should not substitute their judgment for that of the NLRB in determining how best to undo the effects of unfair labor practices," and the Board's "choice of a remedy must be given special respect by reviewing courts, and must not be disturbed unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Id.* at 254 (internal quotation marks and citations omitted).

There is substantial evidence in the record to support the Board's findings that Somerset unlawfully interrogated its employees and solicited their grievances, and that it retaliated against several employees by disciplining and discharging them due to their pro-Union activities. Thus, as detailed herein, we must sustain the Board's conclusion that Somerset violated § 8 of the NLRA.

### 1. Interrogating Employees

An employer violates § 8(a)(1) of the NLRA "by interrogating employees about their union sympathies, when doing so suggests to the employees that the employer may retaliate because of those sympathies." *Hedstrom*, 629 F.2d at 314.

The Board believed several accounts from Somerset employees about management interrogating them before the election. Konjoh asked Claudio how other employees would vote and asked her to vote "no" and give management a chance to improve conditions. CareOne official Jessica

29

Arroyo asked CNA Avian Jarbo whether Somerset was "going to get a 'no' vote" from her. (J.A. 30.) Konjoh asked Stubbs what she thought of the Union and stated that, although Stubbs had a union at another job, "we don't want one here." (J.A. 30.) Illis, the highest-ranking management official at the facility, asked Tyler "where are you in terms of voting?" (J.A. 30 (editorial marks omitted).) She further asked whether Tyler knew how her coworkers were voting, and whether Tyler could convince them to vote no. Throughout the course of those sorts of questions, "[n]o assurances were made to the employees" that they would not face retaliation for failure to cooperate with management. (J.A. 31.)

Though Somerset contests the characterization of the questioning as coercive, when employee testimony about the interrogations conflicted with that of Somerset managers, the ALJ and the Board credited the version given by the employees, explaining that they "testified in a straightforward, confident, consistent manner." (J.A. 30.) The Board's credibility determinations are entitled to "great deference." *Atlantic Limousine, Inc. v. NLRB*, 243 F.3d 711, 718 (3d Cir. 2001). In light of the testimony credited by the Board, substantial evidence supports its conclusion that management officials at Somerset questioned employees in a manner unlawfully coercive under § 8(a)(1) of the NLRA.

## 2. Retaliation

Section 8(a)(3) of the NLRA prohibits an employer from taking adverse employment actions against an employee in retaliation for union membership or activities. 29 U.S.C. § 158(a)(3). The Board applied the burden-shifting analysis

articulated in a case called *Wright Line*, 251 NLRB 1083, 1087 (1980), which was approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 402 (1983). [12] Under *Wright Line*, "the employee must establish that the protected conduct was a 'substantial' or 'motivating' factor [for the employer's action]. Once this is accomplished, the burden shifts to the employer to demonstrate that it would have reached the same decision absent the protected conduct." 251 NLRB at 1087.

Without recounting anew the facts summarized above, we conclude that the Board did indeed have substantial evidence to support its conclusions that Claudio, Napolitano, Jacques, and Wells were targeted because of their union support and that Somerset's justifications for the adverse employment actions it took were simply pretextual.

The principal response Somerset gives to the Board's ruling on retaliation is that the stricter policies it instituted after the election were actually motivated by a "history of poor nursing home performance that long predated union activity at the facility." (Opening Br. at 50.) But the timeline does not bear that out. The deficiencies uncovered in the

---

[12] Although the Court later abrogated a portion of *Transportation Management* on grounds not relevant here, the central holding "remains intact. The NLRB's approach in *Transportation Management* is consistent with § 7(c) [of the NLRA] because the NLRB first required the employee to persuade it that antiunion sentiment contributed to the employer's decision." *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 278 (1994).

December 2009 survey were deemed "isolated" (J.A. 3039), and, within weeks, Somerset had corrected them and submitted a successful correction plan to state authorities. The very next month, a resurvey found Somerset in substantial compliance. In fact, no significant discipline or tightening of policy took place close to the December 2009 inspection that Somerset suggests was the reason for its stricter policies. Instead, the discipline began months later, immediately following the union election. The timeline that Somerset urges us to consider thus supports the Board's finding that Somerset was unlawfully motivated when it disciplined and discharged the four union activists. *See, e.g.*, *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 814 (3d Cir. 1986) (timing and departure from past practice indicates unlawful motive); *Hanlon & Wilson Co. v. NLRB*, 738 F.2d 606, 614 (3d Cir. 1984) (union animus and disparate treatment indicate unlawful motive); *Champion Parts Rebuilders, Inc. v. NLRB*, 717 F.2d 845, 850-51 (3d Cir. 1983) (timing and disparate treatment establish unlawful motive).

### 3.   Solicitation of Grievances

Section 8(a)(1) of the Act prohibits an employer from interfering with, restraining, or coercing its employees in the exercise of protected concerted activities. 29 U.S.C. § 158(a)(1); *see also id.* § 157. To establish a violation, "it need only be shown that under the circumstances existing, [the employer's conduct] may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act." *Hedstrom Co. v. NLRB*, 629 F.2d 305, 314 (3d Cir. 1980) (en banc) (internal quotation marks omitted). An employer violates Section 8(a)(1) by expressly or impliedly

32

promising to remedy employee grievances if they reject the Union. *Id.*

In this case, the Board credited employee testimony that, after the union petition was filed, Hutchens and Illis told employees they would try to "fix" things. The Board made particular mention that management transferred Heedles and eliminated the proposed scheduling changes which had created employee unrest, that it eliminated one of Tyler's job duties after she complained her job was "overwhelming," and that it made garbage bags available in response to Stubbs's complaint. Substantial evidence supports those findings. Though some of the grievances, when viewed in isolation, may be quite minor, the Board's findings collectively support the conclusion that Somerset solicited employees' grievances, promised to fix them, and, in some cases, did fix them during the election campaign, all in violation of § 8(a)(1) of the NLRA.

## C.     Reinstatement Remedies

As a final argument, Somerset contends that, even if we reject its legal challenges to the Board's findings of unlawful labor practices, we should not enforce the Board's proposed remedies in full. Specifically, it contends that Napolitano, Claudio, Jacques, and Wells should not be reinstated because they would put patients at risk.

The Board does indeed have a "delicate responsibility" in the healthcare services context to "balanc[e] ... conflicting legitimate interests" in a way that safeguards patients and "effectuate[s] national labor policy." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1978) (internal quotation marks

33

omitted). In reviewing the Board's determination, though, our "judicial role is narrow," and an order of the Board "must be enforced" if it is rationally "consisten[t] with the Act" and "supported by substantial evidence on the record as a whole." *Id.* That principle accords with our generally deferential standard of review for the Board's remedial orders, which we review for abuse of discretion. *Kenrich Petrochemicals, Inc. v. NLRB*, 907 F.2d 400, 405 (3d Cir. 1990) (en banc). Moreover, "[r]einstatement is the conventional correction for discriminatory discharges," *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 187 (1941), and we are particularly hesitant to overturn that choice of remedy.

The crux of Somerset's argument is that, even if those four employees were unlawfully dismissed in retaliation for their unionizing activities, the Board failed to consider whether reinstatement was appropriate in light of safety concerns. That, however, is not a fair assessment of the Board's remedial analysis. In applying the *Wright Line* test, the Board evaluated both whether Somerset acted with a discriminatory motive and "would have reached the same decision absent the protected conduct." 251 NLRB at 1087. Therefore, the analysis for unfair labor practices in this case necessarily incorporated the question of whether safety concerns should preclude reinstatement because, if the employees were putting patients at risk, they could have been fired regardless of Somerset's motives. If Somerset could not prove that it would have discharged the four employees for unsafe conduct, it also could not show that the misconduct would have disqualified them from reinstatement. As we have already recognized, substantial evidence supports the Board's determination that the alleged performance deficiencies were merely pretextual reasons for dismissing

34

Napolitano, Claudio, Jacques, and Wells. We therefore also conclude that the Board did not abuse its discretion in determining that the safety concerns Somerset raises against reinstatement are likewise pretextual and invalid.

Of greater concern to us is Somerset's claim that the Board improperly ignored the evidence and expert opinion from the § 10(j) proceedings before the District Court for temporary injunctive relief. The District Court reviewed the record developed before the ALJ, and it held eight days of additional evidentiary hearings and two days of oral argument. The additional evidence included expert testimony on patient safety not presented to the ALJ. The Court then issued a 129-page opinion discussing the case in exacting detail and concluded that reinstatement of Wells and Jacques would endanger Somerset's patients more than it would advance the purposes of the NLRA. Five months later, the Board issued its own decision to the contrary, ordering the reinstatement of both Wells and Jacques, without "specifically address[ing] the particular allegations against Jacques and Wells that motivated the district court to deny them interim reinstatement." (J.A. 2.) We later ruled that the District Court's decision was moot and instructed it to vacate its order, observing that a § 10(j) proceeding "gives a district court authority to enter temporary interim relief" even as the Board retains "exclusive authority to decide the merits of the case." *Lightner*, 729 F.3d at 237 (internal quotation and editorial marks omitted).

The NLRA is structured to allow dual (and potentially dueling) proceedings, as the Board has authority to make determinations to prevent unfair labor practices under § 10(a) and the district courts are separately empowered to

evaluate petitions for temporary relief under § 10(j). 29 U.S.C. §§ 160(a), (j). If a district court comes to one conclusion about appropriate temporary relief in a § 10(j) proceeding, that does not preclude the Board from reaching a contrary conclusion on the merits under the power granted by § 10(a). As one court has put it,

> the Board has exclusive jurisdiction to render initial decisions in these labor matters and the courts [of appeals] merely review such decisions under a "substantial evidence" standard. This is not affected by the fact that the district court judge who heard the Section 10(j) petition had before him the same record that the ALJ had in the unfair labor practices proceeding.

*NLRB v. Kentucky May Coal Co.*, 89 F.3d 1235, 1240 (6th Cir. 1996) (citing 29 U.S.C. § 160). In the sphere of labor relations, Congress has created an environment in which the district courts "attempt to predict what the eventual outcome of the Board's proceedings will be and to act accordingly. If the eventual outcome turns out to be different from what was predicted, however, it is obviously the prediction, not the outcome, that must be rejected." *NLRB v. Q-1 Motor Express, Inc.*, 25 F.3d 473, 477 n.3 (7th Cir. 1994).[13]

---

[13] We are not insensitive to Somerset's frustration over the course of proceedings in this case. The NLRB initiated the § 10(j) action in the District Court. Somerset was forced to defend itself exhaustively in those proceedings and did so with some success, only to have the Court's decision effectively overturned five months later by an administrative

In its 2015 Order, the Board did expressly consider the District Court's § 10(j) determination and reached a different conclusion, finding that the safety concerns were merely pretextual. As to Jacques, the Board said that "before and after the incident in question," Somerset routinely made her a charge nurse, "a position reserved for high-performing nurses." (J.A. 2.) Somerset's contemporaneous actions thus indicate that it "did not actually consider Jacques a threat to patient safety." (J.A. 2.) As to Wells, the Board observed that she had, for months prior to the election, made scheduling errors similar to those for which she was discharged. It was not until after the election that Somerset initiated rapidly escalating discipline, indicating that even Somerset did not see Wells's errors as endangering patient safety until it wanted an excuse to dismiss her. The Board therefore had substantial evidence to conclude that Somerset's own actions establish that Jacques and Wells do not pose a danger to

agency entitled to significant deference on judicial review.

One may question the fairness and efficiency of giving the NLRB two bites at the apple, once before a district court and once before the Board, but that is the structure the NLRA creates in bifurcating adjudication of temporary and permanent relief. The wisdom of using judicial resources as was done here, and of giving the NLRB more than one opportunity to go after a private party for the same alleged wrongdoing, is for Congress to address, not us.

37

patient safety.  We will not, therefore, overturn the reinstatement remedy.[14]

---

[14] Somerset also argues that Wells would have been discharged regardless of any retaliatory action because, following her discharge, Somerset discovered evidence of misconduct that would have led to her dismissal on non-retaliatory grounds.  Somerset is correct that, if it can show it would have discharged Wells anyway based on after-discovered evidence, reinstatement is an inappropriate remedy.  *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995) ("[E]ven though the employer has violated the Act, we must consider how the after-acquired evidence of the employee's wrongdoing bears on the specific remedy to be ordered.").  Specifically, Somerset contends that "Wells [] violated Somerset's Technology Policy ... by forwarding a series of emails containing confidential Somerset information from her work computer to her home email address without permission." (Opening Br. at 55.)

The Board does not contest the fact that Wells sent Somerset scheduling information to herself.  But it points out that it "deferred the matter to compliance proceedings ..., which will provide an opportunity to litigate whether this evidence affects Wells' entitlement to reinstatement and backpay." (Answering Br. at 56 n.8 (citing J.A. 8 n.11).)  The Supreme Court has blessed this form of deferral in cases where the standard remedy of reinstatement and backpay has to be tailored to particular circumstances.  *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 902 (1984) ("This Court and other lower courts have long recognized the Board's normal policy of modifying its general reinstatement and backpay remedy in subsequent compliance proceedings as a means of tailoring the remedy to suit the individual circumstances of each

## IV. Conclusion

For the foregoing reasons, we will deny Somerset's petition for review and grant the Board's cross-application for enforcement.

---

discriminatory discharge."). It is therefore premature for us to evaluate Somerset's arguments regarding after-discovered evidence of Wells's misconduct.