

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-31-1997

# Bro-Tech Corp v. NLRB

Precedential or Non-Precedential:

Docket 95-3343,95-3399

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Bro-Tech Corp v. NLRB" (1997). *1997 Decisions.* Paper 25.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/25

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 95-3343 and 95-3399
_____

BRO-TECH CORP., t/a Purolite
    Petitioner No. 95-3343,

v.

NATIONAL LABOR RELATIONS BOARD
    Respondent.
_____


NATIONAL LABOR RELATIONS BOARD
        Petitioner No. 95-3399,

v.

BRO-TECH CORPORATION, t/a PUROLITE,
        Respondent.

_____


ON PETITION FOR REVIEW AND
CROSS APPLICATION FOR ENFORCEMENT

(Nos. 4-RC-17846 and 4-CA-234586)
_____


ARGUED JUNE 27, 1996

BEFORE:  BECKER, NYGAARD and LEWIS, Circuit Judges.

(Filed January 31, 1997)
_____

Stephen J. Cabot, Esq. (ARGUED)
Harvey, Pennington, Herting & Renneisen
1835 Market Street
Eleven Penn Center, 29th Floor
Philadelphia, PA  19103

        Attorney for Bro-Tech Corp. t/a Purolite


Aileen A. Armstrong, Esq.
Richard A. Cohen, Esq. (ARGUED)
National Labor Relations Board

1099 14th Street, N.W.
Washington, DC  20570-0001

Attorneys for National Labor Relations Board

———————

OPINION OF THE COURT

———————


BECKER, Circuit Judge.

Bro-Tech Corporation t/a Purolite ("Purolite") petitions for review of orders of the National Labor Relations Board ("Board" or "NLRB"): (1) certifying Local 107 of the International Brotherhood of Teamsters as the collective bargaining representative for certain of Purolite's employees; and (2) finding that Purolite engaged in an unfair labor practice by refusing to recognize and bargain with the union in violation of § 8(a)(5) of the National Labor Relations Act.  Purolite seeks to invalidate the certification of the election results and the § 8(a)(5) order on the ground that the union engaged in prohibited campaign practices under the Board's theory of campaign speech announced in Peerless Plywood Co., 107 N.L.R.B 427 (1953), and Alliance Ware, 92 N.L.R.B. 55 (1950), and that the Board acted arbitrarily in failing to set aside the election under the authority of those cases.  The Board has cross-petitioned for enforcement of its orders.  Because we conclude that the Board has neither adequately reconciled its decision in the present case with the theory of campaign speech announced in Peerless Plywood, nor created, with adequate explanation, a new theory of campaign speech to replace the Peerless Plywood rationale, we

2

deny the petition for enforcement, grant the petition for review, and remand for further proceedings.[1]

## I.

## A.

Local 107 ("the Union") petitioned the Board to represent the production, maintenance, warehouse, and laboratory employees of Purolite. Pursuant to a stipulated agreement, the Board conducted an election by secret ballot on July 17, 1992. Employees cast their votes in the plant's ground floor conference room, which we will refer to as the voting room.

On the day of the election, the Union parked a truck equipped with loudspeakers across the street from the plant. From 7:00 a.m. to 4:30 p.m., the truck broadcast taped music with pro-union lyrics. Certain witnesses testified that the music blared throughout the plant, except the so-called Cation plant and the voting room. Other witnesses testified that, when the doors were open, they could hear the songs inside the voting room.

Because the tenor of the lyrics is so important to the resolution of the case, we recite the words of the songs:

First song:

---

1. Purolite also made a charge of improper electioneering based upon the testimony of witnesses Angelo Siano and Jose Mercado about certain representations that Union observer Sammy Santana allegedly made to several employees. The Hearing Officer rejected this testimony, finding both Siano and Mercado unreliable. Instead, the Officer credited the testimony of the Board's observer DeNio, whose version was favorable to the Union. The Board adopted the Hearing Officer's report in this respect. The Board's finding is supported by substantial evidence, and we will neither disturb it nor discuss it further herein.

3

Throughout North America
                        you see us on the job
                        from Atlanta to Calgary
                        Vancouver to Cape Cod

You can't tell us by our color
                        you can't tell us by our hat
                        we're the backbone of the country
                        we take pride in being that

We're brothers and we're sisters
working hard for what is fair
you can always tell a Teamster
by that certain pride he wears

                        Meeting all the challenges
                        united we stand tall
                        Proud to be a Teamster
                        that's why we'll never fall

                        We are the North Americans
                        from sea to shining sea
                        we backed our country in the fight
we earned the right to be

When FDR put out the call
we kept him rolling through it all
we are the workers who stand united
we're Teamsters one and all

We're carving out a better life
for our loved ones old and young
we're giving them the melody
the song that's not been sung

In a moment of reflection
I close my eyes and see
the dreams our fathers had for us
are now reality

                        Second song:

Let's hail the Teamsters Union and sing of it with pride
Remember Teamster members, your Union's by your side

As long as we're together, our numbers will increase
and this will be our motto: prosperity and peace

Now all for one and one for all is something you have heard
But when the Teamsters say it, the boys mean every word

So hail the Teamsters Union and shout it loud and clear
The Brotherhood of Teamsters will always be right here . . .

4

When the election was completed, the Union's margin of victory was five votes.[2]

B.

Purolite filed nine objections to the Union's conduct allegedly affecting the results of the election.  Following an investigation, the Regional Director recommended that all but two of Purolite's objections be overruled without a hearing.  The two remaining objections involved the Union's use of the sound truck and allegations that the Union observer engaged in improper electioneering.  The Regional Director determined that, because these two objections raised substantial material issues of fact, a hearing was necessary to determine whether the use of the sound truck violated the rule promulgated in Peerless Plywood Co., and whether Santana's conduct constituted improper electioneering in the polling area in violation of the rule of Milchem Inc., 170 N.L.R.B. 362 (1968).  See supra n.1.  The Board adopted the Regional Director's Report and Recommendations.

After conducting three days of hearings, the Hearing Officer issued a Report and Recommendations on Purolite's two remaining objections.  As to the Union's use of the sound truck, the Hearing Officer first considered whether the songs constituted campaign speech, writing:

[T]he songs broadcast into the plant on the day of the election were no different than a speech because the lyrics of these songs include campaign phrases such as "the brotherhood of

_____

2.  Purolite challenged the validity of two votes; however, these votes were insufficient to change the outcome of the election.

5

Teamsters will always be right here;" ... .
These messages, although sung and accompanied
by music, are clearly emotional appeals to
sway voters in favor of the Petitioner by
telling the voters how the Petitioner will
benefit them if elected. ... These lyrics
contain significantly more meaning and are
more characteristic of a speech than is the
mere repetition of a slogan to vote for the
Petitioner accompanied by music, which the
Board determined not to be a campaign speech
in Crown Paper Board, 158 N.L.R.B. 440.
Although the songs contained no specific
mention of the Employer, or any campaign
issue, the message behind the lyrics is
clear: The Petitioner, if elected, will be
"working hard for what is fair" and "carving
out a better life," bringing "prosperity and
peace." ... Often, last minute campaign
speeches do not focus on any specific issue
but are more generalized themes of how voting
for a particular party will benefit the
employees. Such is the case here.

The Hearing Officer then recommended that Purolite's
first objection be sustained because the sound truck broadcasts
violated the Board's Peerless Plywood rule against holding
captive audience speeches within twenty-four hours of the
election. However, the Officer rejected Purolite's alternative
argument advanced in its post-hearing brief that the songs
violated the Board's rule, which it announced in Alliance Ware,
against electioneering at or near the polling place. In that
regard, she found that "there [wa]s no evidence that employees
were waiting in line to vote in th[e] corridor [outside the
voting room] where the broadcast was heard," and that "the record
is clear that the broadcast could not be heard within the polling
areas [itself]."

The Board adopted most of the Hearing Officer's Report
and Recommendations, but rejected her conclusion that the sound

truck broadcasts constituted campaign speech.  Instead, the Board concluded that the songs are "more similar to appeals to vote set to music," which the Board had previously determined to be unharmful in Crown Paper Board, 158 N.L.R.B. 440 (1966).  According to the Board, the songs "do not make any specific campaign promises; do not address wages, hours, terms or conditions of employment or other collective bargaining issues; do not refer in any way to the Employer; and indeed, do not contain specific appeals to vote in favor of Petitioner."  As such, "[t]hese phrases do not convey the type of message that requires a response or rebuttal from the employer," and the Union's broadcasts of the songs thus did not violate the Board's rule against campaign speech to a captive audience within 24 hours of an election.  Based on its characterization of the songs, the Board also rejected Purolite's argument that the songs constituted improper electioneering "at or near the polls."  A certificate of representation was then issued.

Despite the Board's decision, Purolite refused to negotiate with the Union.  In response, the Union filed an unfair labor practice charge with the Board.  Purolite admitted its refusal to bargain but challenged the validity of the Board's certification of the Union.  Following motions for summary judgment, the Board concluded that Purolite's refusal to bargain with the Union violated § 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (5).  This appeal followed.  The Board had jurisdiction over the unfair labor practice charge under 29 U.S.C. § 160(a) & (b).  We have

7

jurisdiction to review the Board's decision under 29 U.S.C. § 160(e) & (f).

## II.

Our authority to review an order of the NLRB is limited. "If the Board adopts a rule that is rational and consistent with the Act, then the rule is entitled to deference from the courts. Moreover, if the Board's application of such a rational rule is supported by substantial evidence on the record, courts should enforce the Board's order." District 1199P, National Union of Hospital and Health Care Employees v. NLRB, 864 F.2d 1096, 1101 (3d Cir. 1989) (quoting Fall River Dyeing & Finishing Corp. v. NLRB, 107 S. Ct. 2225, 2235 (1987)); see also NLRB v. Joy Techs., Inc., 990 F.2d 104, 107-08 (3d Cir. 1993). Deference to the Board, however, is not automatic but depends "substantially on the persuasiveness of the agency view." Local 825, Int'l Union of Operating Eng'rs v. NLRB, 829 F.2d 458, 460 (3d Cir. 1987).

Where the review is not a question of fact, "but of a judgment as to the proper balance to be struck between conflicting interests, '[t]he deference owed to an expert tribunal cannot be allowed to slip into a judicial' inertia which results in the unauthorized assumption by an agency of major policy decision properly made by Congress." Id. (quoting NLRB v. Brown, 85 S.Ct. 980, 988 (1965)). In order to persuade the court in these situations, the Board must provide the "reasons for its actions" in addition to "sufficient factual findings to support them." Local 467, Upholsterers' International Union of North

America v. NLRB, 419 F.2d 179, 182 (3d Cir. 1969); see also Atchison, Topeka, & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 807 (1973) (The "arbitrary and capricious" standard of review requires that an "agency [] set forth clearly the grounds on which it acted."); Local 825, Int'l Union Operating Eng'rs, 829 F.2d at 460 ("A position without reasoning has little power to persuade."); NLRB v. Auciello Iron Works, Inc., 980 F.2d 804, 813 (1st Cir. 1992) (quoting Northport Health Servs., Inc. v. NLRB, 961 F.2d 1547, 1553–54 (11th Cir. 1992) ("A court may require that the Board's decision be supported by articulate, cogent and reliable analysis.").

Additionally, where, as here, the Board has reversed a Hearing Officer's findings in its decision, the Board must offer some explanation for the reversal before the court of appeals will defer to its determinations. See Alabama Ass'n of Ins. Agents v. Bd. of Governors of the Fed. Reserve System, 533 F.2d 224, 247 (5th Cir. 1976) (Board's findings are vulnerable "where it merely announces an opposite conclusion from the [ALJ] without explanation"); ITT Continental Baking Co. v. FTC, 532 F.2d 207, 219 (2d Cir. 1976) (when agency departs from the ALJ's findings "it must explain why"); Greater Boston Television Corp. v. FCC, 444 F.2d 841, 853 (D.C. Cir. 1970) ("agency's departures from the Examiner's findings are vulnerable if they fail to reflect attentive consideration to the Examiner's decision"); cf. Zeiglers Refuse Collectors, Inc. v. NLRB, 639 F.2d 1000, 1008 (3d Cir. 1981) (quoting Eastern Eng'g & Elevator Co. v. NLRB, 637 F.2d 191, 197 (1980)) (Board's decision may be less "substantial"

9

when an "impartial experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's ... .").

An additional consideration informs our application of the deference principle in the elections context: the Board acts in this context with scant direction from Congress. Congress has said no more than that elections must be "fair" and free of "interfere[nce], restrain[t], [and] coerc[ion]." See 29 U.S.C. §§ 158-160. The Board has been asked to translate these guideposts into practical rules of election procedure. See, e.g., General Shoe Corp., 77 N.L.R.B. 124 (1948). Considering the limits of Congress's constitutional power to delegate its authority, it gives us pause when the Board acts legislatively without clear Congressional direction unless there is rigorous judicial review.

The line-drawing that the non-delegation doctrine requires has kept the Supreme Court from enforcing it. See Mistretta v. United States, 488 U.S. 361, 415 (1989) (Scalia, J., dissenting) ("But while the doctrine of unconstitutional delegation is unquestionably a fundamental element of our constitutional system, it is not an element readily enforceable by the courts."). We believe, however, that when the circumstances we have described herein operate together, we have an especial right to insist on rigorous, reasoned NLRB decision making. The Board has not supplied such decision making here.


III.


10

A.

In Peerless Plywood, the NLRB prohibited both employers and unions "from making election speeches on company time to massed assemblies of employees within 24 hours before the scheduled time for conducting an election." 107 N.L.R.B. at 429. The Board felt compelled to limit preelection campaigning in these circumstances because experience had demonstrated that last minute speeches delivered to massed assemblies tended "to create a mass psychology which overrides arguments made through other campaign media and gives an unfair advantage to the [speaking] party," and "to destroy freedom of choice and establish an atmosphere in which a free election cannot be held." Id. at 429-30. In an attempt not to circumscribe overly the free speech interests of employers and unions, the Board also noted that the Peerless Plywood rule does not prohibit the use of "any other legitimate campaign propaganda or media," or even the delivery of speeches within 24 hours of an election on or off the premises provided "employee attendance is voluntary and on the employees' own time." Id. at 430.

The NLRB has since applied the Peerless Plywood rule to limit the use of sound trucks as well as assembly speeches. In United States Gypsum Co., 115 N.L.R.B. 734 (1956), the Union used a sound truck to broadcast campaign speeches over a 7 1/2 hour period the day before the election. While the Board noted that Peerless Plywood was usually applied to a group or assembly of employees gathered together for the purpose of hearing a speech, it concluded that "the critical factor in this regard is not the

11

location of the speaker but whether the employees are exposed to his remarks." Id. at 735. Because the sound truck broadcast triggered the same considerations operative in establishing the Peerless Plywood rule, the Board determined that the Union's conduct had "destroy[ed] the freedom of choice of the employees," and set aside the election. Id.

In Crown Paper Board Co., 158 N.L.R.B. 440 (1966), the Union used a sound truck to broadcast during a change of shifts "vote for Local 286" interspersed with music. The Board distinguished both Peerless Plywood and Gypsum, and determined that this use of the sound truck was permissible. The Board first emphasized that, because most employees were not on company time when they were exposed to the broadcasts, Peerless Plywood was inapplicable. Id. at 443. The Board then distinguished Gypsum on several grounds, namely that the broadcast in Crown Paper Board was "only an appeal to vote ... with musical interludes," as opposed to a speech; the broadcast lasted "about an hour," and not all day; and most employees heard the broadcast while arriving or departing from work, and not on company time. Id. at 443-44. Finally, the Board specifically addressed the concerns expressed in Peerless Plywood, concluding that, while the "Union's repetition of a voting slogan and its music may have been `blaring,' `cacophonous,' or even likely to `befoul' the plant `with a babble of commercials and public cheerleading,'" the messages were not the type of messages that would influence voters by creating a mass psychology that overrides other arguments. Id. at 445.

12

B.

The overarching question in this case is whether the songs played by the Teamsters constitute prohibited campaign speech.  The Board determined that they were not.  <u>If</u> the Board had adequately explained how its decision can be reconciled with the <u>Peerless Plywood</u> theory of "campaign speech," or, to the extent that it cannot, what the analytical basis is for the new theory that supports the Board's decision, we would be constrained to defer to the Board's judgment and enforce its order.  But the Board has given no such explanation(s).

We must first consider the Board's decision itself, which, unless we are missing something, is one whose reasoning fails to withstand scrutiny.  The Board's seminal <u>Peerless Plywood</u> decision was driven by a concern that the mass psychology created by campaigning tends to interfere with the "sober and thoughtful choice which a free election is designed to reflect".  <u>Peerless Plywood</u>, 107 N.L.R.B. at 429.  The Hearing Officer, who observed the witnesses and lived with the case, found that test met, concluding that the Teamsters' songs constituted "emotional appeals to sway voters" and as such were "no different than a speech."

Despite the Officer's findings, the Board reversed her decision and certified the election.  Although expressly adopting the Officer's credibility findings and acknowledging that the sound truck broadcasts were audible within the plant throughout the day, the Board reasoned that:  "Contrary to the [H]earing

13

[O]fficer, we find that the Teamsters songs are more similar to appeals to vote set to music, which have been found not to violate the Peerless Plywood prohibition." According to the Board, the songs did not constitute campaign speech because they did "not make any specific campaign promises," and therefore did "not convey the type of message that require[d] a response or rebuttal from the employer." When faced with the rationale underlying Peerless Plywood, the Board peremptorily stated "the broad and amorphous quality of the lyrics would not create the type of 'mass psychology' that concerned" the Peerless Plywood Board. As we see it, in doing so, the Board abandoned without explanation any standard conception of campaign speech it had previously articulated.

Like the Hearing Officer, we believe that the songs at issue clearly fall under the Board's rationale in Peerless Plywood. Referencing the lyrics set forth supra at 5-6, we cannot imagine what would more create "mass psychology" that "tend[s] to interfere with that sober and thoughtful choice which a free election is designed to reflect" than these lyrics, which, especially when set to music, appeal to the most visceral emotions of the workers. That rhetoric is at least as likely and probably more likely to induce "mass psychology" than a dry speech addressing specific campaign issues, even wages and hours. If modern political campaigns have taught us anything, it is that this type of emotional rhetoric has a heavy impact upon the voter. It certainly warrants no less a response from the employer than more specific campaign rhetoric. While we may not

14

substitute the Board's conclusion with our own, even though we find the Board's conclusion to be illogical, we can at the least require that the Board do more than discard its Peerless Plywood doctrine without explanation.

The Board's failure to distinguish the precedent of Peerless Plywood engenders greater concern when viewed as part of the Board's total jurisprudence in this area. As reflected by our previous description of the Peerless Plywood case law, the Board has chosen to develop union election law through ad hoc adjudication. We recognize that the Board generally retains this discretion. See SEC v. Chenery Corp., 332 U.S. 194, 203 (1947). But it is especially unfortunate when the Board puts forth such a patchwork of adjudications without adequate rationalization, thereby abandoning potential litigants inside a maze of decisions with no means to map an exit. In the end, Peerless Plywood, 107 N.L.R.B. 427 (1950), United States Gypsum, 115 N.L.R.B. 734 (1956), Crown Paper, 158 N.L.R.B. 440 (1966), and now this case, create exactly this peril.

The Board defends its decision in part by asserting its congressional mandate to establish the rules in this area. We do not question this mandate. But, as we have noted, in fashioning a new rule, the Board's authority is not without boundaries. The Board may not, by ipse dixit, simply issue new rules (or "interpret" its old ones) without explaining the reason for their issuance (or reinterpretation). See Atchison, Topeka & Santa Fe Ry., 412 U.S. at 807. In light of its disregard for the Hearing Officer's findings and its departure from the Peerless Plywood

15

rule, the Board must explain itself in order to obtain the deference that it seeks.

The Board, therefore, had two options in approaching this case: it could have (1) explained how its decision to make the existence of specific campaign issues the dispositive issue in this case is consistent with the Peerless Plywood rationale; or (2) with adequate explanation, created a new theory of campaign speech to replace the Peerless Plywood rationale. It did neither. For this reason, and in order to provide the Board with the opportunity to satisfy this standard, we will deny the petition for enforcement, grant the petition for review, and remand for further proceedings.

IV.

Purolite's alternative argument is that, because the broadcasts could be heard directly outside the voting room and inside the room when the door was open, the broadcasts violated the rule established in Alliance Ware, 92 N.L.R.B. 55 (1950), and, therefore, the Board's failure to apply Alliance Ware amounts to an abuse of discretion. See Industrial Acoustics Co. v. NLRB, 912 F.2d 717, 722 (4th Cir. 1990) (holding that the failure to apply Peerless Plywood rule without abandoning it constitutes an abuse of discretion).

In Alliance Ware, a sound truck broadcast "electioneering material" across the street from the employer's parking lot. Although there was no evidence that the sound truck broadcasts were audible inside the plant or in the voting room itself, all employees entering the plant could hear them. After

16

considering the employer's objection, the Board set aside the

election, explaining that:

> The sole question is whether the electioneering conducted by the Petitioner by means of the sound truck was "at or near" the polling place. We believe that it was. The determining factor is not the linear distance from the sound truck to the employees' entrance or the polling place, but the immediacy of the voice of the electioneering broadcaster to the eligible voters as they approached the polling place ... .

Id. at 56.

In the case at bar, the Hearing Officer concluded that Alliance Ware was inapplicable because "there is no evidence that employees were waiting in line to vote in this corridor where the broadcast was heard, and the record is clear that the broadcast could not be heard within the polling areas." Had the Board based its decision exclusively upon the Hearing Officer's conclusion, we would be compelled to grant review and deny enforcement outright for, in Alliance Ware, the Board found that the facts that workers were not waiting in line and that the broadcast could not be heard in the polling place were irrelevant.

The Board, however, found Alliance Ware inapplicable

based upon different reasoning. According to the Board:

> For the same reasons that we do not find the [Union's] conduct objectionable under Peerless Plywood, we find no merit in the Employer's argument that the [Union's] broadcast of the Teamsters songs constituted improper electioneering "at or near the polls" under Alliance Ware, 92 N.L.R.B. 55 (1950). In addition, we find it significant that although Alliance Ware is a soundcar case, it predates Peerless Plywood and the Board's application of the Peerless Plywood rule in soundcar cases.

17

Bro-Tech Corp., 315 N.L.R.B. 1014, 1015 n.7 (citations omitted). Purolite submits that because Alliance Ware defines "at or near the polls," and Peerless Plywood defines campaign speech, the inquiries are clearly distinct. We are less certain; as is evident, the reasoning in this case defies easy explanation. In contrast, counsel for the Board argues that the Board simply overruled Alliance Ware as incompatible with Peerless Plywood. That too is far from clear. The Board's decision here appears to adopt or recognize the same definition for campaign speech and electioneering in the context of sound trucks. But if electioneering deserves more protection than campaign speech, as it may, then the status of Alliance Ware after Peerless Plywood and the decision in this case is a mystery.

Because of our disposition of the Peerless issue, we have no need to reach the Alliance Ware issue. But as the discussion in Part III as well as this Part IV suggest, the Board's law in this area is in a state of confusion. We will leave the Alliance Ware issue to the Board on remand, but we suggest that this area of Board law could benefit from thoroughgoing review and clarification.

V.

For the foregoing reasons, the Board's Petition for Enforcement will be granted in part and denied in part, and the petition for review will be granted in part and denied in part.

18

The case will be remanded to the Board for further proceedings consistent with this opinion.[3]

---

3.  Purolite has argued that it was entitled to an evidentiary hearing for its objection that the totality of the circumstances required an new election.  With election challenges, however, a party is only entitled to an evidentiary hearing if the challenge raises "substantial and material factual issues."  NLRB v. ARA Services, Inc., 717 F.2d 57, 67 (3d Cir. 1983) (in banc); St. Margaret Mem'l Hosp. v. NLRB, 991 F.2d 1146, 1156 (3d Cir. 1993).  We leave it to the Board to determine on remand whether an evidentiary hearing on the "totality" issue is in order.