**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1031
_____


1621 ROUTE 22 WEST OPERATING COMPANY, LLC
d/b/a SOMERSET VALLEY REHABILITATION AND NURSING CENTER,
                                                    Petitioner

v.

NATIONAL LABOR RELATIONS BOARD,
                                        Respondent


1199 SEIU UNITED HEALTHCARE WORKERS EAST, NEW JERSEY REGION,
                                                    Intervenor

_____

No. 12-1505
_____


NATIONAL LABOR RELATIONS BOARD,
                                        Petitioner


1199 SEIU UNITED HEALTHCARE WORKERS EAST, NEW JERSEY REGION,
                                        Intervenor

v.

1621 ROUTE 22 WEST OPERATING COMPANY, LLC,
d/b/a SOMERSET VALLEY REHABILITATION AND NURSING CENTER,
                                                    Respondent

_____

No. 16-3212
_____


1621 ROUTE 22 WEST OPERATING COMPANY, LLC
d/b/a SOMERSET VALLEY REHABILITATION AND NURSING CENTER,
                                                    Petitioner

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent


*1199 SEIU UNITED HEALTHCARE WORKERS EAST,
Intervenor


*(Pursuant to the Clerk's Order dated 8/25/16)


_____

No. 16-3400
_____

NATIONAL LABOR RELATIONS BOARD,
Petitioner

*1199 SEIU UNITED HEALTHCARE WORKERS EAST,
Intervenor

v.

1621 ROUTE 22 WEST OPERATING COMPANY, LLC
d/b/a SOMERSET VALLEY REHABILITATION
AND NURSING CENTER,
Respondent


*(Pursuant to the Clerk's Order dated 8/25/16)


_____


On Applications for Review and Enforcement of Orders of
the National Labor Relations Board
(NLRB Nos. 22-CA-64426, 22-CA-069152, 22-CA-074665)

Argued:  April 5, 2017

Before:  CHAGARES, SCIRICA, and FISHER, <u>Circuit Judges</u>

(Filed: March 14, 2018)

Rosemary Alito (ARGUED)
George P. Barbatsuly
Meghan T. Meade
K&L Gates LLP
One Newark Center, 10th Floor
Newark, New Jersey 07102

Jonathan E. Kaplan
Tanja L. Thompson
Littler Mendelson
3725 Champion Hills Drive
Suite 3000
Memphis, TN 38125

  *Counsel for Petitioner/Cross-Respondent*

Linda Dreeben
Jill A. Griffin
Elizabeth A. Heaney
Dexter E. Sutton, Sr.
David Casserly (ARGUED)
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570

  *Counsel for Respondent/Cross-Petitioner*

Patrick J. Walsh (ARGUED)
William S. Massey
Katherine H. Hansen
Gladstein Reif & Meginniss, LLP
817 Broadway, 6th Floor
New York, NY 10003

  *Counsel for Intervenor-Respondent*

_____

OPINION[*]

_____

CHAGARES, Circuit Judge

Before us are petitions to review or enforce two orders of the National Labor

Relations Board ("NLRB" or "Board") related to unionization activities at a New Jersey

nursing home. The orders pertain, respectively, to the certification of the employees'

union and the employer's decision to terminate a group of nurses following their

unionization. For the reasons that follow, we will deny the petitions for review and

enforce both orders.

I.

A.

We write solely for the parties and recount only the facts relevant to our

disposition. Petitioner 1621 Route 22 West Operating Company, LLC ("Somerset")

operates a New Jersey nursing home. On July 22, 2010, after being contacted by

Somerset employees, intervenor 1199 SEIU United Healthcare Workers East (the

"Union") petitioned the NLRB for authorization to serve as the employees' collective

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

bargaining representative.[1]  At this time, Somerset employed, inter alia, registered nurses ("RNs") and licensed practical nurses ("LPNs").  An election to approve the Union was scheduled for September 2, 2010.

As part of its organizing campaign, the Union distributed a flyer featuring the words "Our Opportunity to Vote Yes is Here!" and a photograph of Somerset employees captioned with "At Somerset We're Voting Yes for 1199SEIU!"  Joint Appendix ("J.A.") I[2] 666-68.  The flyer also included the images and names of approximately forty employees appearing alongside individual statements in support of the Union.

In order to obtain content for the flyer, organizer Brian Walsh contacted employees, described the flyer, and requested that they sign a release form.  The release form, titled as such, authorized the Union to use employee photographs and statements in campaign materials and required the signatures of the employee and a witness.  The form also contained two prompts:  first, "Speak from the heart — How does having a union improve your life and/or the life of your family?  Be specific"; and second, "How does having a union help you provide better care?  Be very specific."  E.g., J.A. I 669.  Nowhere did the form ask whether the employee supported the Union or how the employee intended to vote.  Forty-nine employees signed the release form, many of

---

[1] In response to the unionization efforts, Somerset engaged in anti-union activities that the Board concluded to be unlawful, a decision that we enforced.  1621 Route 22 W. Operating Co., LLC v. NLRB ("Somerset II"), 825 F.3d 128, 145-46 (3d Cir. 2016).

[2] This matter involves multiple consolidated petitions.  Each captioned 1621 Route 22 W. Operating Co., LLC v. NLRB, we will refer to 3d Cir. Nos. 12-1031 and 12-1505 as "Somerset I" and 3d Cir. Nos. 16-3212 and 16-3400 as "Somerset III."  We denote to which case a referenced filing belongs with a "I" or a "III," respectively.

5

whom answered the prompts. Walsh photographed the employees and recorded several testimonials for a campaign video.

Many of the statements on the flyer attributed to an employee do not replicate the employee's response on the release form he or she signed.[3] Jillian Jacques, a Union supporter who signed seventeen release forms as a witness, admitted that she did not actually witness the execution of each form and that she fabricated some employees' answers to the form's prompts. Jacques, however, claims to have spoken with most of the employees before completing the form in their absence.

The election took place in a Somerset conference room. It was supervised by an NLRB agent and an observer from Somerset and the Union. Employees voted behind a cardboard, NLRB-approved, table-top voting booth which shields voters' lower arms and hands.[4] The booth was easily displaced and its position changed throughout the day as employees bumped it. Some employees testified that parts of their bodies were visible or that they thought that they could be observed voting, and Somerset's observer stated that she was able to see voters' hands. Neither observer, however, objected to the use of the voting booth.

While polls were open, Walsh and another organizer text messaged and telephoned several employees to remind them to vote. Although some employees

---

[3] In its order rejecting Somerset's objections to the election, the Board found that the attributed statements were, if not identical, "substantially similar" to employees' release-form responses. J.A. I 24-25.

[4] The booth is designed to be mounted to a base, which the Board agent declined to use.

received a text message or telephone call before having cast a ballot, the Board found that no employee was contacted by a Union official while standing in line to vote.

Employees voted in favor of the Union 38-28, with five challenged votes. Subsequently, Somerset filed fourteen objections to the election and petitioned the NLRB to set aside the results.

Following a hearing, an Administrative Law Judge ("ALJ") recommended that the NLRB overrule all of Somerset's objections. On August 26, 2011, the NLRB adopted the ALJ's findings and certified the Union as the exclusive collective-bargaining representative of Somerset employees. 1621 Route 22 W. Operating Co., 357 N.L.R.B. 736 (2011). Mark Pearce, one of the three Board members assigned to the panel hearing the case, was recused and did not participate in the Board's decision.

Somerset filed a motion for reconsideration, arguing in part that Craig Becker, another panel member, should have recused himself from the case. The Board denied Somerset's motion.

While the objection proceedings were pending, the Union asked Somerset to begin bargaining. Somerset refused, contending that the Union's request was invalid, and ignored a second request from the Union.

The NLRB's acting general counsel ("AGC") filed a complaint alleging that Somerset committed unfair labor practices in violation of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151, et seq. In its answer to the complaint Somerset reserved the right to challenge the Union's certification in the event that the Board denied Somerset's then-pending motion for reconsideration.

7

On December 30, 2011, the Board issued an order finding that Somerset violated NLRA § 8(a)(1) and (5) by refusing to recognize, bargain with, and provide information to the Union. 1621 Route 22 W. Operating Co., LLC, 357 N.L.R.B. 1866 (2011) (the "Certification Order").[5] Somerset filed a petition for review in this Court, and the NLRB filed a cross-petition to enforce the order. 1621 Route 22 W. Operating Co., LLC v. NLRB, 3d Cir. Nos. 12-1031, 12-1505 ("Somerset I").

B.

In 2009, prior to the unionization campaign, the New Jersey Department of Health ("NJDOH") conducted its annual review of Somerset and returned a critical report. The report cited several deficiencies, including instances of poor patient treatment. At this time, a Somerset administrator "form[ed] the opinion" that Somerset's patients required a greater level of care than its staff of LPNs was able to provide. J.A. III 457-58.

The NJDOH issued another critical report following its 2010 review, conducted after the Union's election. Somerset did not increase employee discipline or training in response to the critical reports. Rather, Somerset decided in May 2011 to employ RNs exclusively — who, by virtue of training and licensing, are able to offer patients more complex care — and "reposition" itself as an "all-subacute facility." Petitioner's Br. III 12. Somerset began to fill open nursing positions with RNs. Eventually the two remaining LPNs, Irene D'Ovidio and Maharanie Mangal, were terminated.

---

[5] Member Pearce did not participate in consideration of the motion to reconsider or the Certification Order.

8

According to Somerset, it decided to employ only RNs in response to the critical NJDOH reports, to improve patient care, and because relying on RNs was a growing healthcare trend. Somerset maintains that, after eliminating the LPN position, it began to market itself exclusively to short-term subacute patients, for whom RNs are better equipped to provide care.

The Board and the Union paint a different picture. They argue that Somerset's patient population, and the services provided by its nursing staff, did not appreciably change after Somerset eliminated the LPNs. Moreover, according to the cross-petitioners: no research or evidence underlay Somerset's determination that RNs would improve the patient care in its facility; at the time of the administrative hearing, no other New Jersey facility operated by Somerset's managing companies employed only RNs; and contrary to Somerset's characterizations and stated goals, Somerset's reputation and level of care have suffered since eliminating LPNs.

By letter dated January 30, 2012, the Union requested access to Somerset's facility to observe the employees' working conditions. Somerset ignored this request. The Union filed a series of unfair labor practice charges which prompted the AGC to issue complaints against Somerset.

In January 2013, following a hearing, the ALJ found that Somerset committed the violations charged in the AGC's complaints. On March 5, 2013, Somerset filed exceptions to the ALJ's decision. Three years later, on March 10, 2016, Somerset moved to dismiss the underlying complaints, alleging that they were invalid because the AGC had been serving in violation of the Fair Vacancies Reform Act ("FVRA"), 5 U.S.C. §

9

3345, et seq.  The NLRB's current general counsel ("GC") issued a Notice ratifying the AGC's actions on March 21, 2016.

On July 13, 2016, the NLRB adopted the ALJ's findings and expanded the ALJ's recommend remedies.  1621 Route 22 W. Operating Co., LLC, 364 N.L.R.B. No. 43 (2016) (the "Retaliation Order").  Specifically, the NLRB found that Somerset's decision to eliminate the LPN position, discharge D'Ovidio and Mangal, and deny the Union access to its facility violated NLRA § 8(a)(1), (3), and (5).  The Board also denied Somerset's motion to dismiss, finding that Somerset forfeited its FVRA challenge by failing to raise it timely and that the issue was mooted by the GC's ratification of the underlying complaint.  The NLRB ordered Somerset to, inter alia, reinstate the LPN position and return to the LPNs any work transferred to RNs.

Somerset filed a petition to this Court to review — and the NLRB filed a cross-petition to enforce — the order.  1621 Route 22 West Operating Co., LLC v. NLRB, 3d Cir. Nos. 16-3212, 16-3400 ("Somerset III").

The Union intervened in support of the Board's cross-petitions to enforce the Certification and Retaliation Orders.  All petitions were timely, and we consolidated the petitions in Somerset I and Somerset III.

II.[6]

---

[6] The Board had jurisdiction under 29 U.S.C. § 160(a).  We have jurisdiction to review the Board's final order and consider the petition for enforcement under 29 U.S.C. § 160(e) & (f).  In general, we exercise plenary review over the Board's legal conclusions.  MCPC Inc. v. NLRB, 813 F.3d 475, 482 (3d Cir. 2016).  The other standards that guide our review are described herein as needed.

10

On appeal, we consider whether: (1) Member Becker should have recused himself because of his past employment with the SEIU; (2) the GC properly ratified the actions of the AGC who filed the underlying complaints in Somerset III and who was serving in violation of the FVRA; (3) substantial evidence supported the NLRB's findings in the Certification Order; (4) substantial evidence supported the NLRB's findings in the Retaliation Order; and (5) the NLRB abused its discretion by ordering the reinstatement of the discharged nurses.

## A.

### 1.

Before reaching the merits of the NLRB's orders, we address Somerset's procedural challenges.[7]  Somerset first asks us to set aside the Certification Order because Member Becker, one of the two members in the panel majority, should have recused

---

[7] In addition to the challenges discussed infra, Somerset argues that the Certification Order is invalid because the NLRB's delegation to the panel that issued the order violated the quorum requirements of 29 U.S.C. § 153(b).  At the relevant time, the Board consisted of only three members, one of whom was Member Pearce, who recused himself from consideration of the merits of Somerset's objections.  Somerset contends that because of this recusal only two Board members — fewer than the required three, see New Process Steel, L.P. v. NLRB, 560 U.S. 674, 681-84 (2010) (interpreting 29 U.S.C. § 153(b)) — existed who could have delegated the matter to the panel.

This challenge is foreclosed by our recent decision in NLRB v. New Vista Nursing & Rehabilitation, 870 F.3d 113 (3d Cir. 2017), where we rejected a similar argument. There, as here, the Board noted in the underlying order that Member Pearce, "who is recused and did not participate in the underlying decision, is a member of the present panel but did not participate in deciding the merits of this proceeding."  870 F.3d at 127 (emphasis omitted).  Like the Court in New Vista, "[w]e see no reason to look behind the Board's statement that [Member] Pearce participated in the delegation and then recused from substantive deliberations."  Id. at 128.

11

himself.  We review Board member recusal decisions for abuse of discretion and will reverse only if they are "arbitrary or unreasonable."  1621 Route 22 W. Operating Co., LLC v. NLRB ("Somerset II"), 825 F.3d 128, 143-44 (3d Cir. 2016) (citations omitted).

Prior to joining the NLRB, Member Becker served as counsel to the SEIU, the international union with which the Union is affiliated.  Somerset argues that the SEIU often collaborates with its local affiliates, and that the Union here is particularly large and made significant monetary contributions to the SEIU when the case was before the Board.  Therefore, according to Somerset, Member Becker's participation created an appearance of impropriety, violating the ethical standards governing administrative decisonmakers.  See 5 C.F.R. § 2635.101(b)(14).

We disagree.  International unions and their local affiliates are separate and distinct legal entities.  In re Gen. Teamsters, Warehousemen & Helpers Union, Local 890, 265 F.3d 869, 874-75 (9th Cir. 2001) ("[F]ederal labor law has steadfastly recognized the separation of the International from its local affiliate.").  Somerset does not argue that Member Becker had previously worked with or for the Union.[8]  Nor does Somerset articulate how a one-time financial arrangement between the Union and Member Becker's former employer, with whom he has no continuing relationship, creates an appearance of bias.  In other words, we see nothing unreasonable or arbitrary

---

[8] Member Becker has committed to recusing himself in cases involving local unions he, or one of his former employees, actually represented.  See Serv. Emps. Local 121RN (Pomona Valley Hosp. Med. Ctr.), 355 N.L.R.B. 234, 238-39, 242-43 (2010).

about Member Becker's decision to participate in this matter. Accordingly, the Board did not abuse its discretion in denying Somerset's recusal challenge.

2.

Somerset seeks to set aside the Retaliation Order because it resulted from complaints issued by the AGC, who Somerset contends was serving in violation of the FVRA. This contention is correct. See NLRB v. SW Gen. Inc., 137 S. Ct. 929 (2017). The Board nonetheless rejected Somerset's challenge because the Board's then-GC ratified the original complaints.[9]

On March 21, 2016, days after Somerset filed its motion to dismiss, the GC issued a Notice of Ratification. In it, he determined that "[a]fter appropriate review and consultation with my staff, I have decided that the issuance of the complaint in this case and its continued prosecution are . . . proper" and he "ratif[ied] the issuance and continued prosecution of the complaint." J.A. III 2 n.4.

Proper ratification of an administrative decision may "adequately address[] the prejudice" to a party stemming from an earlier unauthorized act. Advanced Disposal Servs. E., Inc. v. NLRB, 820 F.3d 592, 602 (3d Cir. 2016) (citation omitted). There are three requirements for valid ratification: the ratifier must be authorized to take the ratified action; he must "have full knowledge" of the action; and he must "make a detached and considered affirmation of the earlier decision." Id. Through these

---

[9] The Board also held that Somerset forfeited its challenge by failing to raise it prior to the 2016 motion to dismiss. We need not address the forfeiture issue because we determine that the ratification was valid.

13

requirements, we attempt to "ensure that the ratifier does not . . . simply rubberstamp the earlier action." Id. at 602-03. Evidence of "detached and considered judgment" can come from "express ratification" involving "an independent evaluation of the merits," or ratification that is "implied from subsequent conduct." Id. at 603 (citations omitted). All that said, our review of agency action is informed by "the presumption of regularity," by which we presume that public officials have properly discharged their duties absent "clear evidence to the contrary." United States v. Chem. Found., Inc., 272 U.S. 1, 14-15 (1926); see also Kamara v. Att'y Gen. of U.S., 420 F.3d 202, 212 (3d Cir. 2005) (noting that "it is the petitioner's burden to show that the [agency] did not review the record when it considered the appeal").

Somerset argues that the GC merely "rubberstamped" the earlier actions by issuing a cursory ratification — mirroring those issued in numerous other cases — after Somerset raised its challenge. But boilerplate language and suspect timing do not amount to "clear evidence" that the GC was disingenuous when he asserted that he conducted "appropriate review and consultation with his staff" before concluding that the charges against Somerset were "meritorious." J.A. III 2 n.4. His detached consideration of the matter is further evidenced by the fact that the Board "continued forward in the normal course of agency adjudication" through its continued litigation of the complaints. See Advanced Disposal Servs. E., 820 F.3d at 604 (citation and quotation marks omitted). At base, Somerset fails to rebut the presumption that the GC acted properly. We will sustain the Board's determination that the ratification was valid.

B.

14

We now address Somerset's substantive challenges to the Certification and Retaliation Orders. "In considering the Board's decision, we accept factual findings as conclusive if supported by substantial evidence," Somerset II, 825 F.3d at 144 (citation omitted), and "will uphold the Board's interpretations of the [NLRA] if they are reasonable," MCPC Inc. v. NLRB, 813 F.3d 475, 482 (3d Cir. 2016). Substantial evidence is "more than a mere scintilla"; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Mars Home for Youth v. NLRB, 666 F.3d 850, 853 (3d Cir. 2011) (quotation omitted). The Board's credibility determinations stand so long as they are not "inherently incredible or patently unreasonable." Grane Health Care v. NLRB, 712 F.3d 145, 149 (3d Cir. 2013) (quotation omitted). As discussed below, the record evidence satisfies this deferential standard, and we will enforce the Board's orders.

1.

Somerset first finds a series of faults with the Union's election and subsequent certification.[10] Collective bargaining elections must be "fair" and "free of interference, restraint, [and] coercion," Bro-Tech Corp. v. NLRB, 105 F.3d 890, 895 (3d Cir. 1997) (alterations and citation omitted), and the Board must take "every reasonable precaution to ensure voting secrecy," Zeiglers Refuse Collectors, Inc. v. NLRB, 639 F.2d 1000,

---

[10] The Board's finding in the Certification Order that Somerset violated the NLRA is predicated on the Board's decision overruling Somerset's objections to the Union's election. Accordingly, we may review the Board's findings related to the election as part of the record underlying the decision which Somerset petitions us to review. 29 U.S.C. § 159(d); see, e.g., NLRB v. ARA Servs., Inc., 717 F.2d 57, 69 (3d Cir. 1983).

15

1005 (3d Cir. 1981) (citation omitted). That said, the Board enjoys a "wide degree of discretion" in establishing election "procedure and safeguards." NLRB v. A.J. Tower Co., 329 U.S. 324, 330 (1946). No election is perfect, and we will not set one aside unless "coercive conduct has poisoned the fair and free choice which employees are entitled to make." Zeiglers Refuse Collectors, 639 F.2d at 1005. Mindful of this standard, we consider Somerset's specific objections.

a.

Somerset contends that the Union distributed a flyer featuring employee statements which were obtained without permission and which the employees did not actually make, warranting a new election. In overruling this objection, the Board found that the flyer was merely unobjectionable campaign propaganda.

The Board does not entertain objections to campaign materials on the basis that those materials contain misrepresentations. Midland Nat'l Life Ins. Co. ("Midland"), 263 N.L.R.B. 127, 129-33 (1982) (approved by us in NLRB v. Rhone-Poulenc, Inc., 789 F.2d 188, 191 (3d Cir. 1986)). Instead, it will only intervene "where a party has used forged documents which render the voters unable to recognize propaganda for what it is." Id. at 133.

The Union's flyer was "recognizable as propaganda of a particular party" and thus did not contravene the Midland standard. N. Am. Directory Corp. v. NLRB, 939 F.2d 74, 78-79 (3d Cir. 1991) (citation omitted). Somerset nonetheless seeks to invalidate the vote because the flyer contained "pervasive" and "artful deceptions" and may have made

16

undecided employees feel compelled to support the Union.[11]  See BFI Waste Servs., 343

N.L.R.B. 254, 254-55 (2004); In re Allegheny Ludlum Corp., 333 N.L.R.B. 734, 744-45

(2001).

We share Somerset's concerns with the way the Union used employees'

statements and likenesses in campaign materials.  The release forms did not solicit

employees' intended votes but only sought ideas about how employees might benefit

from a union.  Although the Board found that the printed statements fairly represented

employee sentiment, the attributed quotes at best loosely paraphrased employees'

answers to the release form prompts.  A supporter fabricated several of her co-workers'

statements, and at least one employee featured on the flyer did not sign the form that bore

his purported signature.

Ultimately, however, we defer to the Board's factual findings.[12]  These include

that an organizer explained to employees the Union's plans for the statements on the

release forms — which every testifying employee but one confirmed they signed — and

that the supporter who fabricated quotes spoke with her co-workers before doing so.

Notably, Somerset presents no evidence of employees who were featured on the flyer but

---

[11] We have referenced these standards when noting criticism of the Midland rule but have not explicitly adopted them.  See St. Margaret Mem'l Hosp. v. NLRB, 991 F.2d 1146, 1158-59 (3d Cir. 1993) (citing Van Dorn Plastic Mach. Co. v. NLRB, 736 F.2d 343, 348 (6th Cir. 1984)).  Although the Board ultimately relied on Midland to reject Somerset's challenge, it addressed, and found unavailing, Somerset's arguments pertaining to the flyer misrepresentations.  We proceed similarly.

[12] The Board also determined, and argues here, that the precedent relied upon by Somerset is inapposite.  We need not address this because regardless, substantial evidence shows that the Union's misrepresentations do not warrant vacating the election.

17

did not support the Union or who felt unduly compelled to vote for the Union. In other words, whatever deceit worked by the Union did not in the end "undermine the employees' freedom of choice."[13] St. Margaret Mem'l Hosp. v. NLRB, 991 F.2d 1146, 1158-59 (3d Cir. 1993) (citation omitted). Accordingly, substantial evidence supports the Board's rejection of this challenge.

b.

Somerset next argues the election should be set aside because of the Union's electioneering on the day of the vote.

The NLRB has devised rules "to eliminate the unfair advantage gained by last minute electioneering and pressure as well as to minimize the distraction and interference which result therefrom." Bos. Insulated Wire & Cable Co., 259 N.L.R.B. 1118, 1118 (1982). These include prohibitions against "prolonged conversations between representatives of any party to the election and voters waiting to cast ballots," Milchem, Inc., 170 N.L.R.B. 362, 362 (1968), and delivering mass communications to assembled

---

[13] We are concerned that the hands-off approach to monitoring campaign materials set forth in Midland hampers the Board's ability to ensure free and fair collective-bargaining elections. Although we decline to set aside the election in this case, we do not condone the Union's fast-and-loose campaign methods. Legitimate reasoning underlies the Midland standard, which trusts employees' capacity for recognizing propaganda and "minimize[s] . . . dilatory claims attacking [election] results." J.A. I 11 (citing Midland, 263 N.L.R.B. at 131); see also N. Am. Directory Corp. v. NLRB, 939 F.2d 74, 78 (3d Cir. 1991). But such a rule invites turning a blind eye to misrepresentations in campaign materials which in some circumstances may be "so material and fraudulent" that "the Board's insistence upon certifying the fraudulent election, based on Midland, might constitute legal error." St. Margaret Mem'l Hosp., 991 F.2d at 1158-59 (citation omitted). This case does not present such circumstances, but we do not discount the possibility of one arising in the future.

employees within twenty-four hours of an election, such as through speeches or sound trucks, see Peerless Plywood Co., 107 N.L.R.B. 427, 429-30 (1953); U.S. Gypsum Co., 115 N.L.R.B. 734, 734-75 (1965). Somerset contends that the Union violated both rules by text messaging and telephoning employees on election day.

Somerset's argument is unavailing. First, although some employees received Union communications before having voted, there is no evidence of such contact while an employee was waiting in line to cast a ballot. Considering "all the facts and circumstances," substantial evidence supports the Board's finding that the electioneering did not "impair[] the exercise of free choice." See Glacier Packing Co., 210 N.L.R.B. 571, 573 n.5 (1974); see also Bos. Insulated Wire & Cable, 259 N.L.R.B. at 1119 (listing factors to consider when assessing electioneering).

Second, the text messaging was not a prohibited mass communication. The "critical factor" here is determining how and where the "employees [were] exposed to [the speaker's] remarks." Bro-Tech, 105 F.3d at 895 (quotation omitted). Because employees were free to disregard the text messages and phone calls, which were delivered to them in isolation, no violation of Board policy occurred. Cf. Va. Concrete Corp., 338 N.L.R.B. 1182, 1187 (2003); Peerless Plywood, 107 N.L.R.B. at 430 (allowing speeches within twenty-four hours of an election where "employee attendance is voluntary"). Again, these grounds do not warrant setting aside the election.

c.

Somerset also objects to the election on the grounds that the voting booth did not adequately protect voter privacy.

19

An election may be set aside if "the manner in which the election was conducted raises a reasonable doubt as to [its] fairness and validity." Polymers, Inc., 174 N.L.R.B. 282, 282 (1969). Procedural irregularities do not automatically invalidate an election. See St. Vincent Hosp., LLC, 344 N.L.R.B. 586, 587 (2005) (citation omitted). Instead, "the Board will not set aside the election under the Polymers standard absent evidence that someone witnessed how a voter marked his or her ballot." Physicians & Surgeons Ambulance Serv., Inc., 356 N.L.R.B. 199, 199 & n.1 (2010) (citation omitted).

Driving Somerset's challenge is speculation that the voting booth, which was easily jostled by users and was repositioned throughout the day, failed to obscure ballots while being marked. Some employees testified to thinking that their arms and hands may have been visible behind the booth but none perceived that somebody witnessed how they voted. Somerset's election observer did testify that she was able to watch voters mark their ballots. The Board, however, discredited the observer's testimony, a decision which Somerset fails to challenge adequately in its briefs.[14] Accordingly, substantial evidence supports the Board's finding that any problems with the voting booth did not create a reasonable doubt as to the election's "fairness and validity," and we will enforce its order.[15]

_____

[14] Even accepting the observer's testimony, there continues to be a lack of direct evidence that anyone actually saw how a particular ballot was marked.

[15] The Board has set aside elections where "voting arrangements could have led employees to believe they were being observed as they voted" even though "there was no evidence that any observer could see how any ballot had been marked." Columbine Cable Co., 351 N.L.R.B. 1087, 1087-88 (2007) (collecting cases). But these cases are distinguishable, involving circumstances, for example, in which ballots were cast without

20

2.

a.

We turn to review of the Retaliation Order. Somerset first challenges the Board's finding that by eliminating the LPN classification without Union consent, Somerset impermissibly altered the scope of the bargaining unit in violation of NLRA § 8(a)(1) and (5).

We have recognized that "[u]nder the NLRA, employers and unions are required to bargain over 'wages, hours, and other terms and conditions of employment.'" Hamilton Park Health Care Ctr. Ltd. v. 1199 SEIU United Healthcare Workers E., 817 F.3d 857, 865 (3d Cir. 2016) (citation omitted); accord 29 U.S.C. § 158(d). For these "mandatory subjects of bargaining," the union is obligated to "negotiate in good faith" over any proposal or risk the employer's unilateral action. Id.; Aggregate Indus. v. NLRB, 824 F.3d 1095, 1099 (D.C. Cir. 2016). "But," as the Board explained in its order here, "eliminating a unit classification alters the scope of the [bargaining] unit, and such an action is a permissive subject of bargaining." J.A. III 3 (emphasis added). These are issues over which a union may, but does not have to, negotiate; "[a] unilateral change to a permissive subject of bargaining is illegal." Aggregate Indus., 824 F.3d at 1099; see also

booths at all or with unsanctioned, impromptu devices. See id. at 1087 (ballots cast on an open counter); Imperial Reed & Rattan Furniture Co., 118 N.L.R.B. 911, 913 (1957) (improvised booth comprised of stacked chairs and cushions); Royal Lumber Co., 118 N.L.R.B. 1015, 1017 (1957) (lean-to shed with a wooden board resting on two oil drums, and a nonvoter standing in the doorway). The Board argues that it has never overturned an election due to secret-ballot concerns in which a Board-sanctioned voting booth was used, Physicians & Surgeons Ambulance Serv., Inc., 356 N.L.R.B. 199, 200 (2010), and this case does not compel us to deviate from that pattern.

The Wackenhut Corp., 345 N.L.R.B. 850, 852 (2005) ("[O]nce a specific job has been included within the scope of a bargaining unit by either Board action or consent of the parties, the employer cannot unilaterally remove or modify that position without first securing the consent of the union or the Board." (citations omitted)).

That Somerset decided to replace its LPNs with RNs without Union consent is undisputed. Indeed, Somerset never challenged the Board's finding that the action constituted an unfair labor practice. Somerset instead protests that the causes for its decision relieved it of its bargaining duty, citing cases announcing exceptions to the duty to negotiate over mandatory subjects of bargaining. As the Board explained, however, it "has never found an exception to an employer's duty to refrain from unilaterally changing the scope of a unit . . . based on defenses recognized in cases dealing with mandatory bargaining subjects." J.A. III 4. Because Somerset does not confront this finding, on which the Board's decision relied, its challenge is forfeited.[16] As a result, we will enforce the Board's order finding that Somerset unlawfully modified the bargaining unit's scope.[17]

_____

[16] Somerset fleetingly argues that, for purposes of its defense, the distinction between mandatory and permissive bargaining subjects is immaterial. It only cites, however, a case discussing whether an employer's decision to subcontract employees' work was a mandatory bargaining subject — a question not present here (and which subverts Somerset's contention that such a distinction is unimportant). See Furniture Rentors of Am., Inc. v. NLRB, 36 F.3d 1240, 1246-49 (3d Cir. 1994). The Board's central finding — that Somerset altered the scope of the bargaining unit, a permissive subject of bargaining, without Union consent — is unchallenged.

[17] Even if we were to consider the merits of Somerset's asserted defenses, we would endorse the Board's finding that they were unavailing. Somerset argues that the decision to eliminate the LPNs (1) involved a change in the scope and direction of its

22

b.

Somerset next challenges the Board's finding that it violated NLRA § 8(a)(5) by denying the Union access to its facilities.

An employer's duty to bargain under the NLRA includes the duty to "provide information that is needed by the bargaining representative for the proper performance of its duties." NLRB v. Acme Indus. Co., 385 U.S. 432, 435-36 (1967) (citation omitted). Relevant here, this duty includes allowing union access to the workplace, but an employer may deny access where the union "can effectively represent employees through some alternate means other than by entering on the employer's premises." Holyoke Water Power Co., 273 N.L.R.B. 1369, 1370 (1985).

Somerset contends that the Union's access to the workplace was unnecessary. Although a Union officer testified that he could interview employees about workplace conditions and their responsibilities — some of the reasons for which access was requested — he maintained that the Union would need to "actually see" the facilities and "what kind of assignments folks have" in order to fulfill its representative role. J.A. III

---

enterprise; (2) was not predicated on avoiding labor costs; and (3) was motivated by compelling economic circumstances.

The transition to employing RNs did not fundamentally alter the business because the RNs perform the same work as had been performed by the LPNs and the facility's patient population has largely remained the same. Although there is no evidence that labor costs motivated Somerset's decision, there is substantial evidence supporting the Board's conclusion that Somerset's proffered motives were not credible and that there was no reason to believe that Somerset's "future viability" depended on its action. Cf. Dorsey Trailers, Inc. v. NLRB, 134 F.3d 125, 132 (3d Cir. 1998). Finally, the critical NJDOH reports, on which Somerset relies, are insufficient to demonstrate compelling economic circumstances warranting the employment change.

23

134-35. Substantial evidence supports the Board's finding that Somerset's argument otherwise was unavailing, and we will enforce the Board's order pertaining to Somerset's failure to grant access.

c.

Somerset disputes the Board's finding that it violated NLRA § 8(a)(3) by discharging the LPNs.

An employer violates § 8(a)(3) where it refuses to hire or discharges an employee because of anti-union animus. NLRB v. Alan Motor Lines Inc., 937 F.2d 887, 890-92 (3d Cir. 1991). To establish such a violation, "[t]he [GC] bears the initial burden of making a prima facie showing by a preponderance of the evidence that protected conduct was a motivating factor in the employer's conduct." Id. at 891 (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 813 (3d Cir. 1986)). The burden then shifts to the employer to "demonstrate that the employee would have been discharged regardless of his or her union membership." NLRB v. Omnitest Inspection Servs., Inc., 937 F.2d 112, 122 (3d Cir. 1991) (citation omitted).

Given that the Board found (and we agreed) in Somerset II that Somerset's anti-union animus was "beyond question," J.A. III 16, and given the suspect timing of the decision to eliminate the LPNs,[18] there is substantial evidence demonstrating a prima facie case of discrimination.

_____

[18] Somerset unlawfully retaliated against employees soon after the election, see Somerset II, 825 F.3d at 136-37, and decided to transition to an RN-only model shortly following the Board's attempt to reinstate fired LPNs.

24

Somerset then failed to meet its burden of demonstrating that non-discriminatory rationale motivated its decision. The Board found that: despite Somerset's alleged repositioning of its business, there was little change in Somerset's marketing or patient population after it eliminated the LPNs; Somerset made few attempts to remedy deficiencies noted by the NJDOH before changing its employment model; and notwithstanding a "history" of poor patient care, Somerset did not decide to eliminate LPNs until following their unionization. Moreover, the Board discredited testimony from a Somerset administrator that the transition to employing RNs has improved patient care.

Although Somerset expounds on the merits of its decision, it fails to demonstrate that those merits compelled it to act. Most problematic for Somerset is the dearth of evidence showing that any deliberation, research, or debate took place among administrators leading up to the decision. The record contains only an officer's testimony that she was concerned about patient care, and that eliminating the LPNs was discussed "over several conversations." J.A. III 584. Without more, we decline to disturb the Board's findings that Somerset fails to sustain its burden. Substantial evidence supports the Board's finding that Somerset unlawfully retaliated against its employees.[19]

d.

---

[19] The Board found both that Somerset committed unlawful retaliation by eliminating the LPN position generally and by discharging D'Ovidio and Mangal individually. Somerset does not challenge the latter finding; accordingly, we will enforce that portion of the order as well.

25

Somerset challenges the Board's order to reinstate the LPN position and return to LPNs the work that had been transferred to RNs.  It argues that this remedy contravenes federal healthcare law and exceeds the Board's discretion.

We employ a "generally deferential standard of review for the Board's remedial orders, which we review for abuse of discretion."  Somerset II, 825 F.3d at 147.  Board orders warrant closer scrutiny, however, where they concern areas over which the Board has little expertise.  See Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 144 (2002) (explaining that courts should not defer to the NLRB when it "trench[es] upon federal statutes and polices unrelated to the NLRA").  As Somerset argues, the Board cannot order an employer to violate federal law or flout clear federal policy.  See, e.g., id. at 151 (vacating the Board's order to provide back pay to an undocumented immigrant); NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528-29 & n.9, 534 (1984) (vacating the Board's enforcement of a collective bargaining agreement executed prior to a company's bankruptcy because it would vitiate protections provided by bankruptcy law).  Somerset fails to show, however, what federal law or policy the Board's remedy contravenes.

Somerset cites provisions of the Federal Nursing Home Reform Amendments[20] that establish standards for nursing homes that participate in Medicare and Medicaid.  See Grammer v. John J. Kane Reg'l Ctrs.–Glen Hazel, 570 F.3d 520, 523 & n.1 (3d Cir. 2009) (discussing the statute).  Among other requirements, nursing facilities must

---

[20] These amendments, codified at 42 U.S.C. §§ 1995i–3, 1396r, were part of the Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100–203, §§ 4201–4218, 1987 U.S.C.C.A.N. (101 Stat.) 1330, 1330–160 to –221.

26

"promote maintenance or enhancement of the quality of life of each resident," 42 U.S.C. § 1395i–3(b)(1)(A), and "provide services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident," id. § 1395i–3(b)(2). The law also mandates having RNs on call for certain periods of time. Id. § 1395i–3(b)(4)(C)(i).

Nowhere does the law prohibit the employment of LPNs. If it did, then Somerset would have been operating unlawfully for years prior to its decision to eliminate the position. Moreover, in no way does the Board's order confine Somerset to providing substandard patient care. In other words, the remedy does not conflict with federal law.

We appreciate Somerset's expertise in operating nursing facilities, an expertise which the Board lacks. Were there robust evidence supporting Somerset's reasoning for restructuring its workforce, we would hesitate to condone the Board's interference. But, as the Board found, Somerset failed to show that the LPNs were to blame for the NJDOH's critical reports, careful deliberation preceded the transition, patient care has improved as a result of employing only RNs, or Somerset has appreciably changed the patient population it serves. On this record, the Board concluded that Somerset's decision was not informed by healthcare expertise but by anti-union animus. That the Board seeks to remedy this harm by undoing Somerset's action does not flout the law nor trench upon Somerset's responsibility for providing adequate care for its patients. Cf. Beth Israel Hosp. v. NLRB, 437 U.S. 483, 501 (1978) (noting the Board's "delicate responsibility" in the healthcare services context to "balanc[e] . . . conflicting legitimate

27

interests" so as to safeguard patients and "effectuate national labor policy").

Accordingly, the Board did not abuse its discretion, and we will enforce its order.

III.

For the reasons set forth above, we will deny the petitions for review and grant the petitions for enforcement.